FLAUM, Circuit Judge.
 

 Taracorp, Inc. (“Taracorp”) sued NL Industries, Inc. (“NL”) for indemnification of certain environmental clean-up liabilities under their March 4, 1985 Agreement. Exercising its diversity jurisdiction, the district court granted summary judgment for NL. The district court found that the language of the Agreement unambiguously excluded the type of claim Taracorp was making and noted that the extrinsic evidence offered confirmed this conclusion. We reverse.
 

 I.
 

 Taracorp, a Georgia corporation with its principal place of business in Atlanta, Georgia, owns and operates scrap metal and metal fabricating businesses throughout the country. NL, a New Jersey corporation with its principal place of business in Houston, Texas, formerly owned substantial assets in the metal industry, including several lead smelting facilities. In 1979 Taracorp purchased three lead smelting plants from NL, which were located in Granite City, Illinois; McCook, Illinois; and St. Louis Park, Minnesota. The disputed liability in this case involves the St. Louis Park facility.
 

 From 1979 to 1982, Taracorp operated the St. Louis Park plant in the same manner as NL had been operating the plant. In fact, Taracorp assumed NL’s role in a Battery Processing Agreement (dated August 18, 1978) with Union Scrap Iron & Metal (“Union Scrap”). Under the Battery Processing Agreement, Taracorp (and previously NL) would purchase spent batteries and then have them shipped directly to one of Union Scrap’s three locations, all located within five miles of the St. Louis Park facility. Union Scrap would then break apart the batteries and send the lead plates to Taracorp for smelting. The Battery Processing Agreement clearly states that the batteries and the battery plates remain at all times “the sole and exclusive property of [Taracorp]” (originally NL). This relationship with Union Scrap continued until 1982, when Taracorp shut down the St. Louis Park plant.
 

 In the early 1980’s, the United States Environmental Protection Agency (“EPA”) asserted several environmental claims against NL and Taracorp regarding the St. Louis Park facility. In October of 1981, the EPA placed the St. Louis Park site on the National Priorities list for Superfund ranking. In 1983 the EPA expanded the boundaries of the listed St. Louis Park site to include an adjoining auto scrap yard site, the “Golden Property.” By 1984 the EPA and the Illinois Environmental Protection Agency (“IEPA”) were also investigating environmental .contamination at Taracorp’s Granite City, Illinois lead smelting facility.
 

 Taracorp filed a Chapter 11 bankruptcy petition in 1982. As part of Taracorp’s Plan of Reorganization, Taracorp entered into an Agreement on March 4, 1985 (the “Agreement”) with NL and the IEPA regarding responsibility for the environmental hazards at the Granite City and St. Louis Park sites.
 
 [1]
 
 The IEPA was involved only in the Granite City negotiations (since St. Louis Park is in Minnesota). The parties agree that the interpretation of this Agreement determines
 
 *741
 
 the result in this case; hence the relevant provisions of the Agreement will be quoted here at some length.
 

 The first section of the Agreement, which appears to function as a kind of preamble, states as follows:
 

 The parties hereto are desirous of effecting a means for allocating costs and responsibility with respect to certain environmental claims by IEPA and others against [Taracorp] and NL, all relating to facilities sold by NL to [Taracorp] pursuant to Agreement dated August 22, 1979. NL has agreed with all parties hereto to assume certain responsibilities regarding the investigative and remedial costs relating to these matters and [Taracorp] has agreed to provide consideration to or for the benefit of IEPA and NL in conjunction therewith.
 

 Twelve of the Agreement’s twenty-four sections exclusively address the Granite City facility. Only one section is exclusively addressed to the St. Louis Park plant. The Granite City sections establish that Taracorp is to set up a subsidiary corporation, the “New Corporation,” to which all the assets of the Granite City plant are to be transferred. The New Corporation is then to “assume exclusive responsibility and be solely liable for all of [Taracorp’s] liability for payment of all investigative and remedial clean-up costs relating to contamination located at, on, or near [Taracorp’s] Granite City, Illinois Facility. ...”
 

 The Agreement limits the Granite City environmental liability of the New Corporation/Taracorp to $500,000, not including ground water contamination claims and costs relating to current or future operations of the Granite City facility, which would remain the sole responsibility of the New Corporation. The Agreement consistently (five times) designates the environmental pollution connected with the Granite City plant as “contamination located at, on, or near [Tara-corp’s] Granite City Facility.” Three of the references farther note that the contamination referred to is that which “originated from” the Granite City facility. The Granite City provisions conclude by establishing NL’s obligation to indemnify and hold harmless Taracorp and the New Corporation for all federal environmental liabilities “with respect to alleged environmental hazards located at, on or near the Granite City Facility.”
 
 [2]
 

 Only section eight of the Agreement deals exclusively with the St. Louis Park facility. The parties agree that the IEPA played no role in the drafting of this section. The section provides that, upon the fulfillment of two specific pre-conditions,
 
 [3]
 
 Taracorp “will, on the Effective Date of the Plan of Reorganization, transfer to NL by deed ... all of [Taracorp’s] assets at the St. Louis Park Facility, said transfer being limited to the form of ownership interest received by [Ta-racorp] from NL on August 22, 1979.... ” Agreement section 8(c) establishes NL’s indemnification responsibilities with respect to the St. Louis Park plant and is the provision upon which Taracorp bases this lawsuit. It reads as follows:
 

 Upon conveyance of [the St. Louis Park Facility to NL], NL shall bear the responsibility for all investigative and remedial clean-up costs associated with said Facility and shall indemnify [Taracorp] for all obligations, responsibilities and liabilities, costs and expenses asserted against it related to environmental hazards associated with said Facility, excluding, however, any costs and expenses relating to (i) damages claimed or incurred by private parties arising out of air emissions which may have occurred as a result of [Taraeorp’s] operation of such Facility after August 22, 1979, (ii) actions arising from activities of [Tara-corp] which activities were unrelated to the
 
 *742
 
 regular conduct of the business at the St. Louis Park Facility....
 

 Taracorp was discharged from bankruptcy on June 27, 1985.
 
 [4]
 
 In 1990, however, the EPA notified Taracorp that it was considered to be a “potentially responsible party” (“PRP”) under the Comprehensive Environmental Response, Compensation and Liability Act (“CERCLA”) for environmental contamination caused by Union Scrap’s battery-breaking activities at its Washington Avenue North location (“Union Scrap I”). The EPA claimed that Taracorp had “arranger” liability under § 107(a)(3) of CERCLA (42 U.S.C. § 9607(a)(3)) for clean-up of environmental contamination at the site, which had resulted (in part) from the breaking up of Taracorp’s batteries for its St. Louis Park plant. The EPA sued Taracorp and many others on this theory later that year. In 1993, the EPA notified Taracorp that it was also considered a PRP for the cost of remediation at Union Scrap’s 15th Avenue North site (“Union Scrap III”). And in 1994, the Minnesota Pollution Control Authority (“MPCA”) notified Taracorp that it was liable to reimburse the State of Minnesota for environmental response costs at Union Scrap’s Plymouth Avenue location (“Union Scrap II”).
 

 Taracorp sought dismissal from the Union Scrap I case, claiming that the CERCLA claim was barred by its 1985 discharge in bankruptcy. The bankruptcy court had set a July 5, 1983 deadline for the filing of claims against Taracorp. Taracorp argued that since the St. Louis Park facility had been shut down since 1982, no new claims could have arisen since 1982. Taracorp also argued that because the EPA had not filed a claim or even a “contingent claim” in Taracorp’s bankruptcy proceedings, the CERCLA arranger liability claim was barred. The bankruptcy court handling the Union Scrap I case saw things differently and held that the CERCLA claim was not barred, since the CERCLA claim did not “arise” until after the confirmation of Taracorp’s Plan of Reorganization.
 
 United States v. Union Scrap Iron & Metal,
 
 123 B.R. 831, 838 (D.Minn.1990).
 
 [5]
 
 NL, who was also facing possible CERCLA arranger liability in the litigation, supported the EPA’s position regarding Taracorp (i.e., the position ultimately taken by the court) and further argued that even if Taracorp dropped out of that case, NL’s own contribution and indemnity claims against Taracorp should survive.
 
 Id.
 
 at 834-35. Taracorp did not appeal the decision, and the litigation eventually settled.
 
 [6]
 
 Taracorp paid $100,000 as its share of the settlement.
 
 [7]
 

 
 *743
 
 Regarding the Union Scrap II litigation, Taracorp has paid $60,050 as its share of a proposed settlement.
 
 [8]
 
 The amount of Tara-corp’s liability and its defense costs for the MPCA’s 1994 claim regarding Union Scrap II are not yet established.
 

 Taracorp has sued NL for indemnification, under the Agreement, for its liability and expenses for these Union Scrap claims. The district court, after comparing the Granite City indemnity provision with the St. Louis Park indemnity provision, found that the Agreement clearly established that NL was not obligated to indemnify Taracorp for its St. Louis Park/Union Scrap environmental liability, since the contamination at the Union Scrap sites was not “at, on, or near” the St. Louis Park site. The court concluded: “While the phrase ‘associated with’ may not be as precise as the phrase ‘at, on, or near’, the entire context of the agreement supports reading ‘associated with’ to mean ‘at, on, or near’ the St. Louis Park Facility.” While the court found no need to resort to extrinsic evidence, as the Agreement was unambiguous, it also determined that “the extrinsic evidence supports a narrow reading of the [St. Louis Park] indemnification clause.” The court declared that the Agreement was designed to address problems of contamination “originating at” the two lead smelting facilities. Consequently, the court granted NL’s motion for summary judgment and denied Taracorp’s motion for summary judgment.
 

 II.
 

 We review the district court’s grant of summary judgment de novo.
 
 Smith v. Shawnee Library Sys.,
 
 60 F.3d 317, 320 (7th Cir.1995). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party, here NL, is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c);
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The parties agree that Illinois law governs our interpretation of the Agreement and its indemnity provisions.
 

 Summary judgment in a diversity contract case such as this one should be considered as follows:
 

 First, it is necessary to look to the plain language of the provision at issue. Reviewing Illinois law, this Court has noted that “[t]he starting point must be the contract itself. If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over.” .... If the plain language of the contract is ambiguous, then “the court must go on to declare [the contract’s] meaning.” - If the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide_ However, if the parties dispute the extrinsic evidence on an ambiguous contract, then a fact-finder must be called upon to determine the intent of the parties.
 

 Lumpkin v. Envirodyne Indus.,
 
 933 F.2d 449, 456 (7th Cir.) (internal citations omitted), ce
 
 rt. denied,
 
 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991);
 
 see also LaSalle Nat’l Bank v. Service Merchandise Co.,
 
 827 F.2d 74, 78 (7th Cir.1987) (interpreting Illinois contract law as providing that “[i]f the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over”);
 
 City of Clinton v. Moffitt,
 
 812 F.2d 341, 344 (7th Cir.1987).
 

 Illinois interprets indemnity agreements according to its general principles of contract law.
 
 Charter Bank v. Eckert,
 
 223 Ill.App.3d 918, 166 Ill.Dec. 282, 288, 585 N.E.2d 1304, 1310 (1992) (“An indemnity agreement is to be construed as any other contract, and under the rules of contract construction, the intention of the parties is the paramount concern.”);
 
 Higgins v. Kleronomos,
 
 121 Ill.App.3d 316, 76 Ill.Dec. 913, 916, 459 N.E.2d 1048, 1051 (1982). Yet Illinois law also provides that indemnity agreements must be set forth in clear and explicit language, so that the indemnitor’s obligations are manifest.
 
 Charter Bank,
 
 166 Ill.Dec. at
 
 *744
 
 288, 585 N.E.2d at 1310. Moreover, since indemnity agreements are not favored in Illinois, they must be strictly construed against the indemnitee.
 
 Id. Fidelity and Deposit Co. v. Rosenmutter,
 
 614 F.Supp. 348, 351 (N.D.Ill.1985).
 

 The March 4, 1985 Agreement establishes the boundaries of NL’s obligation to indemnify Taracorp for environmental liabilities associated with two different facilities: the Granite City facility and the St. Louis Park facility. The language describing NL’s indemnification duties for the two plants, however, is quite different. With regard to the Granite City facility, NL agreed to indemnify Taracorp for environmental hazards or contamination “located at, on, or near” the Granite City facility. This “located at, on, or near” language appears repeatedly in the Agreement sections describing NL’s indemnification responsibilities with regard to Granite City environmental liability. The Agreement further notes that the Granite City environmental contamination contemplated is that which “originated from” the Granite City plant.
 

 When it comes to the single section on the St. Louis Park plant, on the other hand, the Agreement contains much broader language. NL agreed to indemnify Taracorp “for all obligations, responsibilities and liabilities, costs and expenses asserted against [Taracorp]
 
 related to
 
 environmental hazards
 
 associated with
 
 the [St. Louis Park] Facility” (emphasis added).
 
 [9]
 
 The St. Louis Park provision contains no “located at, on, or near” language and no mention of pollution having “originated from” that facility. While the language of the Granite City provision is
 
 locational,
 
 the language of the St. Louis Park provision is
 
 relational.
 
 And when parties to the same contract use such different language to address parallel issues (i.e., indemnification obligations regarding two different facilities), it is reasonable to infer that they intend this language to mean different things.
 
 [10]
 

 Cf. Thompson v. Amoco Oil Co.,
 
 903 F.2d 1118, 1121 (7th Cir.1990) (“Unless a contrary intent is evident, words used in one sense in one part of a contract are deemed of like significance in another part.”) (quoting
 
 Cedar Park Cemetery Ass’n v. Village of Calumet Park,
 
 398 Ill. 324, 75 N.E.2d 874, 880 (1947)). Thus we reject the district court’s conclusion that the St. Louis Park “associated with” language can reasonably be understood to mean the same thing as the Granite City “located at, on, or near” language.
 
 [11]
 

 This principle of contract interpretation parallels the principle that we use when interpreting statutes to determine the intent of legislatures: we assume that the same words mean have the same meaning in a given act and that the choice of substantially different words to address analogous issues signifies a different approach.
 
 See Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.,
 
 872 F.2d 208, 213 (7th Cir.) (comparing statutory use of unqualified “all” with use of “substantially all” and “virtually ah” and concluding that unqualified “all” means 100 percent),
 
 cert. denied,
 
 493 U.S. 847, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989);
 
 cf. BFP v. Resolution Trust Corp.,
 
 — U.S.-,-, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 (1994) (presumption that Congress acts intentionally when particular language included in one section but omitted in another);
 
 United States Nat’l Bank of Or. v. Independent Ins. Agents of America, Inc.,
 
 508 U.S. 439,-, 113 S.Ct. 2173, 2185, 124 L.Ed.2d 402 (1993) (“Presumptively, ‘identical words used in different parts of the same act are intended to have
 
 *745
 
 the same meaning.’ ”) (internal citations omitted);
 
 Kinney v. International Union of Operating Eng’rs, Local 150,
 
 994 F.2d 1271, 1276 (7th Cir.1993). This approach also accords with the basic contract principle that the meaning of separate contract provisions should be considered in light of one another and the context of the entire agreement.
 
 Medcom Holding Co. v. Baxter Travenol Lab., Inc.,
 
 984 F.2d 223, 226 (7th Cir.1993) (“[T]he intent of the parties to a contract must be determined with reference to the contract as a whole, not merely by reference to particular words or isolated phrases, but by viewing each part in light of the others.”) (citations omitted);
 
 Delta Mining Corp. v. Big Rivers Electric Corp.,
 
 18 F.3d 1398, 1403 (7th Cir.1994) (“[I]n construing the meaning of a contractual term we must be mindful of the context in which the word is used_”).
 

 Thus while the indemnification obligation for the Granite City plant is limited to environmental pollution that is spatially connected to the plant (“located at, on, or near”), the St. Louis Park obligation extends to all environmental contamination liability that is “associated with” or “related to” that facility. Since the Agreement developed under the shadow of potential CERCLA liability (the St. Louis Park site was already on the EPA’s National Priorities list), such broad language appears to intend coverage for the full range of CERCLA liability.
 
 See Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.,
 
 14 F.3d 321, 327 (7th Cir.1994) (finding that broad pollution indemnity provision included CERCLA liability even though CERCLA not enacted at time of property transfer);
 
 Harley-Davidson, Inc. v. Minstar, Inc.,
 
 41 F.3d 341, 344 (7th Cir.1994) (finding that general indemnity provision for liabilities “relating to” specific division included CERCLA claims),
 
 cert. denied,
 
 — U.S.-, 115 S.Ct. 1401, 131 L.Ed.2d 289 (1995).
 

 The district court, however, looked to other provisions of the Agreement in concluding that indemnification for St. Louis Park environmental liability was limited to contamination at, on, or near that site, and NL urges us to do the same. Since we are obliged to read contracts as a coherent whole, at least where doing so is possible,
 
 Riney v. Weiss & Neuman Shoe Co.,
 
 217 Ill.App.3d 435, 160 Ill.Dec. 375, 379, 577 N.E.2d 505, 509 (1991);
 
 Medcom,
 
 984 F.2d at 226 (interpreting Illinois contract law);
 
 Air Line Stewards and Stewardesses Ass’n, Local 550 v. Trans World Airlines, Inc.,
 
 713 F.2d 319, 321 (7th Cir.1983), it is appropriate to consider other contract language that may undercut our initial determination that the two indemnity provisions have different scopes.
 
 [12]
 

 NL directs us to look to section one of the Agreement, which begins by noting that “[t]he parties hereto are desirous of effecting a means for allocating costs and responsibility with respect to certain environmental claims by IEPA and others against [Taracorp] and NL.” NL maintains that this language indicates that the parties intended only to address particular, then-existing environmental claims. This preamble-like language cannot reasonably be read in such a broad manner. Even standing alone the provision does not specifically limit the scope of the Agreement to then-existing environmental claims, and NL fails to produce other contract language that would support such a reading. Furthermore, the fact that specific environmental claims provide the occasion for entering into an indemnity agreement, by itself, implies little about the prospective scope of that agreement. The opening provision goes more to the “why?” question, than the “how much?” question. Even if there were a conflict between the general section-one language and the St. Louis Park section-eight language, the specific St. Louis Park indemnity language would prevail over the
 
 *746
 
 general introductory language of the first section.
 
 Brzozowski v. Northern Trust Co.,
 
 248 Ill.App.3d 95, 187 Ill.Dec. 814, 818, 618 N.E.2d 405, 409 (1993);
 
 Medcom,
 
 984 F.2d at 227.
 

 NL also argues that the Agreement’s references to environmental pollution associated with the St. Louis Park
 
 facility,
 
 rather than to the business or business operations there, demonstrate that the indemnity provisions were intended to apply only to environmental contamination actuaUy on that
 
 property.
 
 The Agreement defines “St. Louis Park Facility” according to Taracorp’s Plan of Reorganization, which in turn defines the facility as being “located at 3645 Hampshire Avenue South, Minneapolis, Minnesota.” Thus NL concludes that its St. Louis Park indemnity obligation includes only environmental contamination at that address.
 

 This property-specific approach cannot be reconciled with one of the Agreement’s two cited exceptions to the St. Louis Park indemnity provision. These exceptions exclude coverage for 1) “damages claimed or incurred by private parties arising out of air emissions which may have occurred as a result of [Ta-racorp’s] operation of [the Facility] after August 22, 1979,” and 2) “actions arising from activities of [Taracorp] which activities were unrelated to the regular conduct of the business at the St. Louis Park Facility.” NL’s property-based approach would render the first exception superfluous, a result that fundamental principles of contract law caution us to avoid.
 
 See Thompson,
 
 903 F.2d at 1121 (“we try not to interpret contracts in a manner that would render specific contractual language mere surplusage”);
 
 Dribeck Importers, Inc. v. G. Heileman Brewing Co., Inc.,
 
 883 F.2d 569, 573 (7th Cir.1989) (same for Illinois contract law). Damage to private parties from air emissions does not qualify as environmental contamination of the St. Louis Park
 
 property,
 
 so there would have been no reason to specifically exclude it under NL’s interpretation of the Agreement. Our decision in the factually similar case of
 
 GNB Battery Technologies, Inc. v. Gould, Inc.,
 
 65 F.3d 615, 623 (7th Cir.1995), likewise recognized the importance of heeding the language of specific liability exemptions to avoid rendering them superfluous — thereby effectuating the contractual intent of parties.
 

 Although the second exemption could be consistent with either Taracorp’s or NL’s understanding of the Agreement, the intention expressed by this “non-regular” activities language accords with finding a duty to indemnify for the Union Scrap claims. While NL did not want to assume environmental liability for unanticipated activities at the site (just in case Taracorp had been involved in more than lead smelting), the battery-breaking activities at the Union Scrap locations were well within the scope of Taracorp’s St. Louis Park business. NL can hardly claim surprise at this activity, since it negotiated the Union Scrap contracts in the first place.
 

 If NL had wanted to limit its St. Louis Park obligation to real property contamination, it knew perfectly well how to do so. Rather than merely using the word “facility” (in conjunction with the broad “related to” and “associated with” language), NL could have insisted upon the language of “located at, on, or near” (and thrown in the part about contamination “originating from” the plant), which it used so consistently in connection with the Granite City site. Instead, NL agreed to a broad indemnity provision, and it is stuck with that provision.
 

 Since we find that the Agreement unambiguously establishes NL’s obligation to indemnify Taracorp for its St. Louis Park environmental liability, which includes CERCLA liability for battery-breaking activities at the Union Scrap sites, we do not address the extrinsic evidence presented by the parties.
 

 III.
 

 We conclude that the March 4, 1985 Agreement between Taracorp and NL obligates NL to indemnify Taracorp for all of Taracorp’s St. Louis Park CERCLA liability, including the CERCLA liability for the Union Scrap sites. We Reverse the decision of the district court and REMAND with directions that NL be ordered to indemnify Taracorp for this liability and for expenses already
 
 *747
 
 incurred and for any future liability and expenses.
 

 [1]
 

 . The EPA maintained that Taracorp and NL had "arranged for” the disposal or treatment of hazardous substances under 42 U.S.C. § 9607(a)(3), and were therefore liable to reimburse the government for its response costs.
 

 [2]
 

 . The express exceptions to this indemnity obligation, which are listed in the Agreement, are not relevant to this case.
 

 [3]
 

 . The two pre-conditions are as follows: 1) that a claim for environmental damage, filed by the Minnesota Pollution Control Agency in Tara-corp’s Chapter 11 proceedings, will either have been withdrawn or dismissed, and 2) that a security interest in the St. Louis Park facility, held by Citizens and Southern National Bank, will either have been canceled or conveyed to Taracorp. Since the transfer to NL occurred, and neither party has informed us of any continuing legal issue with respect to these claims, we assume these matters have been resolved.
 

 [4]
 

 . By 1988 NL had completed cleaning up the St. Louis Park site, as well as the adjacent Golden Property.
 

 [5]
 

 . The court rested its analysis on the finding that liability for CERCLA clean-up costs is not "incurred” until after the EPA actually begins spending money. Hence the EPA does not have the kind of claim that could be asserted in a bankruptcy proceeding until after it undertakes actual clean-up efforts or at least recognizes the need for such efforts (allowing it to assert a contingent claim).
 
 Union Scrap,
 
 123 B.R. at 835-36. The court's analysis focussed on the goals of CERCLA and the impracticaliiy of requiring the EPA to anticipate future environmental contamination discoveries (with corresponding clean-up costs) and file prospective claims in every bankruptcy proceeding involving an individual or organization that may eventually be found to be a responsible party under CERCLA.
 
 Id.
 
 at 837-38. While the court noted that ”[t]he parties see a fundamental conflict between the goals of the Bankruptcy Act and the CERCLA/Su-perfund legislation,”
 
 id.
 
 at 835, the court never actually considered the goals of the Bankruptcy Act or offered any reason for finding that the goals of CERCLA (including broad-based liability and efficient administration) trump the goals of the Bankruptcy Act (which presumptively include finality and the minimization of new claims post-confirmation of a reorganization plan).
 

 [6]
 

 . It is a puzzlement why Taracorp did not simply appeal the decision of the bankruptcy court. In a totally separate case, we have since criticized the Minnesota bankruptcy court's decision and rejected the "necromantic definition of 'incurred' " upon which it was based.
 
 GNB Battery Technologies, Inc. v. Gould, Inc.,
 
 65 F.3d 615, 623 (7th Cir.1995). Hence we believe that Taracorp should have appealed the bankruptcy court’s decision at that time and avoided this suit altogether (and the need for NL to indemnify anything). On the other hand, there is no injustice in now holding NL to its obligation to indemnify Taracorp for this same CERCLA liability, since NL contracted to undertake this obligation and argued against Taracorp’s position in the bankruptcy proceeding.
 

 [7]
 

 . Taracorp expended $150,107.32 defending the case.
 

 [8]
 

 . Taracorp asserts that it has paid $60,500 in the settlement and that it has thus far expended $5,823.33 in defending the claim.
 

 [9]
 

 . There are two specific exceptions to this broad liability, which will be discussed further below.
 

 [10]
 

 . Taracorp maintains that the explanation behind the differing scope of the two indemnity provisions lies in the fact that the St. Louis Park facility had been closed since 1982, while at the time of the Agreement, Taracorp intended to continue operating the Granite City facility (making it more important for NL to cabin its liability there).
 

 [11]
 

 . It appears that the district court assumed, and that NL concedes, that unless the “associated with'’/"related to" language is understood as meaning “located at, on, or near," the Agreement's indemnity provision does cover CERCLA "arranger" liability. NL does not argue that the plain meaning of the St. Louis Park indemnity provision excludes CERCLA arranger liability.
 

 [12]
 

 . NL attempts to avoid our comparison of the two indemnity provisions by suggesting that “the Agreement is essentially two contracts in one” and thus that "it cannot be argued that one provision influences the other.” Yet NL provides neither factual nor legal support for this proposition. The seventeen-page document possesses all the outward aspects of a single contract. The fact that the IEPA participated in the Granite Ci1y, but not the St. Louis Park, negotiations does not alter the conclusion that the contract is unitaiy. The fact that IEPA involvement may have garnered a more circumscribed Granite City indemnity obligation gives us no reason to step in and retroactively limit NL’s St. Louis Park indemnity obligation.