**UNITED STATES of America,**

v.

**Donald Lee FENTON, Defendant.**

**Criminal No. 98–01J.**

United States District Court,
W.D. Pennsylvania.

June 29, 1998.

Leon Rodriguez, United States Attorney's Office, Pittsburgh, PA, John J. Valkovci, Jr., United States Attorney's Office, Johnstown, PA, for U.S.

Marketa Sims, Federal Public Defender's Office, Pittsburgh, PA, for Defendant.

### MEMORANDUM and ORDER

D. BROOKS SMITH, District Judge.

Donald Lee Fenton seeks dismissal of Count II of the indictment against him, which alleges that he unlawfully "threaten[ed] to assault and murder John Hugya, legislative aide to John P. Murtha, United States Representative for the Commonwealth of Pennsylvania, 12th Congressional District, with the intent to impede, intimidate, interfere with and retaliate against John Hugya while he was engaged in and on account of the performance of his official duties." Dkt. no. 8, at 2. This threat was allegedly made in the course of a phone conversation to insurance adjuster Randy Leventry concerning repair work on Fenton's truck, during which Fenton threatened to kill Leventry, Murtha, Hugya and "everyone that [sic] worked in the Erie Insurance Office." Dkt. no. 1, at 3. Fenton argues that, even if he made such a threat, Hugya does not fall within the statutory definition of the types of government officials protected by 18 U.S.C. § 115(a)(1)(B), the provision under which he was charged. Thus, as a matter of law, Fenton contends that the indictment at count II must be dismissed.

18 U.S.C. § 115(a)(1)(B) provides, in pertinent part:

Whoever threatens to assault, kidnap, or murder, a United States official ... or an official whose killing would be a crime under [section 1114 of this title] ... shall be punished as provided in subsection (b).[1]

"United States Official" is further defined as "the President, President-elect, Vice President, Vice President-elect, a Member of Congress, a member-elect of Congress, a member of the executive branch who is the head

1. The types of officials omitted by the ellipsis in the above quotation include federal law enforcement officers and United States judges. Hugya falls into neither category.

of a department listed in 5 U.S.C. [§ ] 101, or the Director of the Central Intelligence Agency." 18 U.S.C. § 115(c)(4). A department head within the meaning of 5 U.S.C. § 101 is the top presidential appointee of a cabinet-level department or agency. Hugya is not a member of Congress, a cabinet member, or any other person within the enumerated categories protected by § 115(a)(1)(B). Thus, Fenton may be prosecuted under that section only if Hugya is "an official whose killing would be a crime" under 18 U.S.C. § 1114. That is the question to which I now turn.

■ Section 1114 proscribes the killing or attempted killing of "any officer or employee of the United States or of any agency in any branch of the United States Government...." Although § 115 refers to "officials" while § 1114 uses the term "officer," these two terms have essentially the same meaning at law. *See Gary v. Board of Trustees of Employees' Retirement Sys.*, 223 Md. 446, 165 A.2d 475, 477 (1960); *Black's Law Dictionary* 1084 (6th ed.1990).[2] Had Fenton carried through with his alleged threat, there is little doubt that he could have been prosecuted directly under § 1114, as Hugya is indisputably either an officer or employee of the United States. Here, however, Fenton stands accused only of threatening Hugya, behavior which is criminalized only under § 115(a)(1)(B), although that statute incorporates § 1114 within its scope of protected parties.

Fenton acknowledges that Hugya is a "person" whose killing would be a crime under § 1114, arguing instead that Congress did not incorporate § 1114's full universe of government workers into § 115(a)(1)(B). According to Fenton, when Congress chose to refer to an *"official* whose killing would be a crime" under § 1114, it necessarily excluded mere government employees from its coverage. I agree.[3]

I begin, as I must, with the language of the statute. *United States v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Pope v. East Brunswick Bd. of Educ.*, 12 F.3d 1244, 1249 (3d Cir. 1993). If "the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Ron Pair*, 489 U.S. at 241, 109 S.Ct. 1026 (quoting *Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). In such a case, that is, "where the language of the statute is clear and unambiguous on its face, resort to the legislative history is improper." *Pope*, 12 F.3d at 1249 n. 5 (discussing *West Va. Univ. Hosp. v. Casey*, 499 U.S. 83, 98, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991)). Here, however, the language of § 115(a)(1)(B) makes no explicit reference to threats against either government employees in general or congressional aides in particular. Had Congress intended unambiguously to incorporate such an expansive scope of coverage into this statute, it could have explicitly said so, or merely used the word "person" in place of "official" when it drafted § 115. Alternatively, it could have tracked the language of § 1114 and referred to "any officer or employee of the United States...." Thus, Congress' reference to "an official whose killing would be a

---

**2.** The government argues that, because Congress chose two different words, it must have intended two different meanings. "Official" and "officer," however, are closely related, and the government has cited to no other context in which they are construed disparately. This makes the caselaw on which it relies inapposite. *See Clark v. Chicago Municipal Employees Credit Union*, 119 F.3d 540, 545–47 (7th Cir.1997) ("line of credit" v. "loan"); *Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 988 ("eligible" v. "entitled") (4th Cir.1996); *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir.1996) ("located at, on, or near" v. "related to"). In each of these cases, the court was able to identify, in a principled manner, differences in the terms' common meanings. Because the terms "officer" and "official" are not substantially different and have

not been construed differently from one another, they can only be construed to have the same meaning. *See Taracorp*, 73 F.3d at 744.

**3.** Under § 115, several courts have convicted defendants for threats against lower-level, nonpolicymaking government employees, although none of those defendants appears to have raised the issue that Fenton asserts here. *See United States v. Pacione*, 950 F.2d 1348 (7th Cir.1991) (Internal Revenue officer who dealt routinely with taxpayer); *United States v. Stengel*, No. 88–5268, 872 F.2d 431 (TABLE, text in WESTLAW at 1989 WL 37275 (9th Cir.1989)) (IRS collection agent); *United States v. Leemans*, No. 95–253, 1995 WL 569246 (E.D.La. Sept.22, 1995) (Social Security Administration field office representative).

crime under" § 1114 cannot be said to unambiguously mandate criminal liability for threats against any government employee.

Given this ambiguity in the language of a criminal statute, it is appropriate to look to the legislative history in construing its text. That history, however, suggests that Congress did not intend to include all government employees within the scope of § 115(a)(1).

Section 1114 is the older of the two statutes, having been enacted in 1948 and amended on numerous occasions thereafter. Its purpose was to criminalize the killing of certain enumerated government actors, but was not—and still is not—to protect them against threats. That latter purpose was accomplished by the enactment of § 115 in 1984 and its amendment in 1986.[4]

In 1984, § 1114 recited a whole litany of covered officers[5] and employees, including, *inter alia*, employees of the department of Agriculture charged with the control of animal diseases, employees of the National Park Service, employees of the Consumer Product Safety Commission carrying out regulatory investigations, as well as employees of the FDIC, FSLIC, Comptroller of the Currency and Federal Reserve System. Generally, these were employees who had some regulatory or law enforcement function. Literally dozens of types of personnel were enumerated in this version of § 1114, and its text takes up a full page in *United States Code Annotated* (West 1984).

Nevertheless, congressional aides were not included in the early versions of § 1114, an indication that, whatever the merits of the issue now, Congress could not have been considering whether congressional staff members should fall under § 115's protection then. In 1996, however, Congress stream-lined § 1114 by providing simply that it applies to "any officer or employee of the United States...." Pub.L. 104–132 § 727(a), H.R. Conf. Rep. No. 518, 104th Cong., 2d Sess., 1996 U.S.C.C.A.N. 944, 1996 WL 183509. It is only under the 1996 amendment that a congressional aide could even arguably be covered by either statute, and the legislative history is silent on the intent of the 104th Congress on that issue.

The 1983 Conference Report accompanying § 115 recites the following congressional purpose:

> Part G of Title X is a new provision designed to protect the close relatives of certain high level officials, such as the President, Vice–President, members of Congress, cabinet officers, and federal judges, as well as federal law enforcement officers.... The Committee believes that serious crimes against family members of high level federal officials, federal judges, and federal law enforcement officers, which are committed because of their relatives' jobs are, generally speaking, proper matters of federal concern. Clearly it is a proper federal function to respond to terrorists and other criminals who would seek to influence the making of federal policies and interfere with the administration of justice by attacking close relatives of those entrusted with these tasks. The Committee does not intend, however, that federal jurisdiction over these crimes should be exclusive. In many instances, a crime against, for example, the child of a cabinet officer, even though committed because of the defendant's opposition to the policies of the child's parent, could be adequately handled by state investigators and prosecutors.

---

4. As originally enacted, § 115 proscribed only threats and attempts against the family members of certain government personnel, as well as their assault, kidnap or murder. In 1986, the statute was amended to include the government personnel themselves, rectifying the anomaly under the previous version that made it a felony to threaten the spouse of a Member of Congress, but not the Member himself. Pub.L. 99–646 § 43; H.R.Rep. No. 797, 99th Cong., 2d Sess., 1986 U.S.C.C.A.N.

6138, 1986 WL 31964. No relevant legislative history accompanies this amendment. *See id.*

5. This list included officers not otherwise enumerated in § 115, including a variety of subcabinet level policymaking positions throughout the federal government. Thus, the government is incorrect when it argues that, because § 115 itself set forth a comprehensive definition of officers, construing that section to include only the officers listed in § 1114 would be redundant.

1983 WL 25404, \*625–\*626. This history indicates that Congress was concerned with high policymaking, judicial and law enforcement officers, but that that legislative concern did not extend to federal employees in general. The evident legislative purpose was to preserve the integrity of these governmental functions from disruption by the intimidating effects of threats against the families of key officials. Threats to the families of nonpolicymaking, non-law enforcement federal employees, as reprehensible as those threats are, did not rise to the same level of legislative concern and were left to state criminal law for investigation and possible prosecution.

On the other hand, later in the same conference report, it is stated:

> It should be noted that the new section covers attacks on family members of all the *persons* listed in 18 U.S.C. § 1114 as well as on family members of other law enforcement officers not there listed.

*Id.* at \*628 (emphasis added). From this snippet, the government argues that Congress must have intended to include all federal employees within the scope of § 115. I disagree. For this argument to succeed, Congress must be assumed to have used the word "persons" in the legislative history in a precise, literal sense which contradicted its narrower focus earlier in the same document. It must also be assumed to have used the word "official" in the statutory text itself in a loose fashion to mean "officers and employees." This is untenable. If any language is to be construed literally, it is the text of the statute itself, not a likely stray choice of words in the conference report.[6]

■ Looking at the statute and its legislative history, I cannot conclude that Congress intended for § 115 to apply to all federal officers and employees. At a time when § 1114 included many enumerated types of federal employees within its scope, Congress did not explicitly provide that any person set forth in § 1114 would suffice to trigger criminal liability under § 115, but—deliberately I must presume—chose to include only a government "official" whose killing was proscribed under § 1114. Given the lack of dispositive evidence indicating a contrary intent, Congress will be held to the common law meaning of the words it chose. *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981). As is obvious from general usage, as well as the analysis set forth *infra*, "official" simply does not encompass within its ambit the duties of every employee.[7]

The next question, then, is whether Hugya's position is that of an officer or an official. Relying on the definition of "officer" as a "[p]erson holding [an] office of trust, command or authority in ... government," *Black's Law Dictionary, supra*, at 1083, Fenton argues that Hugya was a legislative aide

---

**6.** Even if the government's "spin" on the legislative history were accepted, it would be unavailing. Such a construction of the conference report would serve only to establish a "grievous ambiguity or uncertainty in the statute[,]" which would still have to be resolved in Fenton's favor under the rule of lenity. *Muscarello v. United States,* —— U.S. ——, ——, 118 S.Ct. 1911, 1919, 141 L.Ed.2d 111, —— (U.S.1998) (Rule of lenity is a narrow principle to be applied "only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." (quoting *United States v. Wells,* 519 U.S. 482, 499, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997))); *see* Staples *v. United States,* 511 U.S. 600, 619 n. 17, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); *United States v. Granderson,* 511 U.S. 39, 54, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994); ("In these circumstances, where text, structure and history fail to establish that the Government's position is unambiguously correct—we apply the rule of lenity and resolve the ambiguity in [defendant's] favor."); *Chapman v. United States,* 500 U.S. 453, 463–64, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991); *Hughey v. United States,* 495 U.S. 411, 422, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990); *Crandon v. United States,* 494 U.S. 152, 158, 168, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990).

**7.** The government makes the final argument that, because a foreign "official" is explicitly defined by 18 U.S.C. § 1116(b)(3)(B) to include an "employee of a foreign government[,]" that statute should be construed *in pari materia* with § 115. Under such a construction, the government urges, "official" must be read to include a government employee as well. I disagree. To the contrary, the fact that Congress chose to enact a specific statutory provision to include certain designated foreign employees within § 1116's definition of an official indicates, if anything, that Congress believed that an employee would not be considered an official absent this language.

to an official—a mere employee—rather than an official himself. Thus, he contends, Count II must be dismissed.

This is a close question. The above dictionary entry goes on to define "Officer of the United States" as, *inter alia,* "one who is appointed under an act of congress...." *Id.* at 1084. Under 2 U.S.C. § 92, members of the House of Representatives are authorized to *"employ* not more than 18 permanent clerk hire employees..." for their *congressional staffs* (emphasis added). Without this specific enactment of Congress, Hugya could not have been hired. Thus, the argument can certainly be made that Hugya is an official.

Nevertheless, Congress' use of the word "employ" in § 92 militates against such a conclusion. Moreover, a review of the caselaw indicates, albeit in other contexts, that courts apply a more sophisticated test than merely whether the incumbent's position was created directly pursuant to statute. This was comprehensively set forth by the late Chief Judge Christian of our sister district of the Virgin Islands almost three decades ago:

> An official, as distinguished from an employee, is a person who is invested by law with a portion of the sovereignty of the state, and who is authorized to exercise governmental functions either of the executive, legislative, or judicial branch of the Government. The employee, on the other hand, is a person in public service whose duties are said to be routine, subordinate, advisory, or as directed. The Congress cannot be deemed but to have legislated with these well established definitions and distinctions in mind. It follows, therefore, that the congressional [reference to] ... "officials" was not intended to include those who are more properly termed "employees." By way of illustration, it has been held in numerous instances that neither teachers nor school supervisory personnel, including principals are public officials. In the same vein, it has been held

that even a school superintendent was not a public official for the reason that he performed his duties under the general control and supervision of the county's board of education and, therefore, did not himself exercise functions pertaining to sovereignty. And not all lawyers in government service are properly described as public officials. A distinguishing feature has been said to be the fact that the employee's obligation is merely contractual in nature, and that he performs his duties under such contract, albeit those duties are public in nature. He does not by the performance of such functions become a public official.

*Chapman v. Gerard,* 341 F.Supp. 1170, 1173–74 (D.Vi.1970) (footnotes omitted) (citing numerous cases), *aff'd,* 456 F.2d 577, 578 (3d Cir.1972).

█ It has been stated that "[i]mplied in *every* public office is an authority to exercise some portion of the sovereign power of the state in making, executing or administering the law." 63C Am.Jur.2d, *Public Officials and Employees* § 230 (1996) (emphasis added); *accord State v. Eastman,* 113 N.C.App. 347, 438 S.E.2d 460, 463 (1994) (director of "cottage life" at state school for blind not a government officer); *In re Sundlun,* 585 A.2d 1185, 1187 (R.I.1991) (director of federally chartered space satellite corporation not a federal officer); *Mullen v. Clark County,* 89 Nev. 308, 511 P.2d 1036, 1037 (1973) (county director of juvenile court services was an employee, not an officer); *Loard v. Como,* 137 S.W.2d 880, 882 (Tex.Civ.App. 1940) (city attorney not a government officer). Even those courts that do not consider the delegation of official government power as the *sine qua non* of official status consider it either the single, or one of the, most important factors. *See Larson v. Alaska,* 564 P.2d 365, 369 (Alaska 1977); *Raven v. Board of Commissioners,* 32 Mich.App. 4, 188 N.W.2d 197, 199 (1971); *Gary,* 223 Md. 446, 165 A.2d 475, 478 (1960).[8]

8. The other factors are whether: (1) the position is created or authorized by a constitutional or statutory provision; (2) the duties of the position are prescribed by law; (3) the position has permanence and continuity, or a fixed term, or

whether it is temporary or occasional; (4) an oath of office or a bond is required; (5) the compensation for the position is fixed by law or is a matter of contract; (6) the incumbent is issued a formal commission; and (7) the position

Here, it cannot be said that Hugya exercises any of the sovereign power of the United States Government. Beyond the obvious distinction that he cannot vote in the House of Representatives or any of its committees, his duties are personal to Representative Murtha, at whose pleasure he serves. Hugya quite properly undertakes to do only that which the Congressman directs, and does not exercise independent authority or discretion in administering the legislative power of the government. Indeed, it appears that Hugya is in charge of Representative Murtha's Johnstown office, where his duties mostly involve constituent service. He is simply not a policymaker. The exercise of "sovereignty"—whatever that term means in the legislative context—belongs to Representative Murtha alone. *See Eastman,* 438 S.E.2d at 462; *Mullen,* 511 P.2d at 1038.

In this regard, *Eastman* is instructive. There, the director of cottage life at a state school for the blind was charged under a criminal statute penalizing the willful neglect of official duties. One of the elements required for prosecution under that statute was status as "an official of a state institution, rather than a state employee[.]" 438 S.E.2d at 462. The court held that because the defendant's decisions were typically reviewed by other school personnel and he had no policymaking function, "[t]he State failed to show any instance where the defendant could exercise sovereign power at any time in the course of his employment." *Id.* at 462–63. It thus held that the defendant was an employee rather than an officer and reversed the conviction as a matter of law. *Id.* at 463.

■ The same result obtains here. Hugya's role is to assist Congressman Murtha in the exercise of his Congressional, sovereign power, not to exercise power independently. Accordingly, Hugya cannot be deemed a federal officer or official, and thus, he cannot be "an official whose killing would be a crime"

under 18 U.S.C. § 1114. Accordingly, allegations that Fenton threatened to kill Hugya, while affording a basis for prosecution under state law, *see* 18 Pa.C.S.A. § 2706, do not implicate 18 U.S.C. § 115(a)(1)(B).

The government attempts to avoid this conclusion by relying upon *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). There, an aide to the senator who published the Pentagon Papers was summoned before the grand jury to give testimony concerning the senator's actions. *id.* at 608, 92 S.Ct. 2614, 33 L.Ed.2d 583. This aide was directly involved in the senator's convening of a late-night subcommittee hearing, at which some of the papers were read into the record. *Id.* at 609, 92 S.Ct. 2614, 33 L.Ed.2d 583. An attempt was made to quash the subpoena on the ground that the conduct at issue was protected by the Constitution's Speech and Debate Clause, Art. I, § 6, cl. 1. *Id.* In the context of applying that clause to the senator's aide, the Court opined that

> it is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aides and assistants; that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos; and that if they are not so recognized, the central role of the Speech and Debate Clause—to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary—will inevitably be diminished and frustrated.

*Id.* at 617, 92 S.Ct. 2614, 33 L.Ed.2d 583 (citation omitted). *See also United States v. Tomblin,* 46 F.3d 1369, 1391 (5th Cir.1995) (stating that, in case where defendant bribed

---

is called an office. *See, e.g., Larson,* 564 P.2d at 369; *Raven,* 188 N.W.2d at 199; *Duncan v. Koustenis,* 260 Md. 98, 271 A.2d 547, 550 (1970); *Gary,* 165 A.2d at 477; *Loard,* 137 S.W.2d at 882. Here, although no record has been made, it would appear that only the first, and possibly the fourth, indicia are satisfied, given the existence of 2 U.S.C. § 92 and the possibility that Hugya

was sworn in when he began his tenure as an aide (although Fenton disputes this). The duties of Hugya's position, however, are determined solely by the Congressman and Hugya serves at his pleasure. Moreover, if Representative Murtha leaves office, Hugya's employment likewise ends.

a congressional aide, "[a] senator's top administrative aide holds a position of substantial influence, because he often serves as the senator's functional equivalent[ ]"). From this, the government makes the argument that a legislative aide is necessarily an officer or official, based on the member of Congress having that status.

*Gravel* is inapposite to the situation presented by this case. The rationale of that case was that the independence of the legislative branch would be impaired if the legislative actions of an aide—actions that would be fully protected if performed by the member of Congress himself—were exposed to judicial scrutiny. Here, in contrast, Hugya's duties fall within the realm of constituent services and are accordingly political, rather than legislative, in character. *See United States v. Brewster,* 408 U.S. 501, 512, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972) (constituent casework is political and not within the ambit of the Speech and Debate Clause); *Romero–Barcelo v. Hernandez–Agosto,* 75 F.3d 23, 29 (1st Cir.1996) (similar). As such, those duties are not invested with any of the sovereignty of the United States, even if Hugya does exercise considerable day-to-day independence and discretion in performing them.

I will therefore grant the motion to dismiss Count II. In reaching this conclusion, however, I in no way minimize the seriousness of the allegations against Fenton as they relate to Hugya. Fenton is alleged to have threatened Murtha, Hugya, Leventry and the whole Erie Insurance office with death. The threats against Murtha are clearly covered by 18 U.S.C. § 115, while those against Leventry and his coworkers are just as clearly not covered. The issue, of course, is not whether threats against Hugya, if made, are deserving of judicial condemnation and punishment—they most assuredly are—but whether such conduct falls within the narrow federal interest that Congress articulated in § 115. My conclusion that it does not means only that the threats against Hugya, like those against Leventry and others who worked at Erie Insurance, should be dealt with by the Cambria County District Attorney in the Court of Common Pleas rather than this court. Given that "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States[,]" *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), I cannot simply assume that it intended to change the federal-state balance over prosecutions for terroristic threats in the absence of some clear indication of that purpose in the statutory language or legislative history. *See id.*

An appropriate order follows.

### ORDER

AND NOW, this 29th day of June 1998, upon consideration of defendant's motion to dismiss Count Two of the Indictment, dkt. no. 40, and the government's response thereto, in addition to the supplemental briefs ordered by the court, it is hereby

ORDERED and ADJUDGED that Count Two of the Indictment be, and the same hereby is, DISMISSED.