**Kenneth W. McELROY, Plaintiff–Appellant,**

v.

**B.F. GOODRICH COMPANY, Defendant–Appellee.**

No. 95–2356.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1995.

Decided Jan. 9, 1996.

George F. Galland, Jr., Jeffrey I. Cummings (argued), Davis, Miner, Barnhill & Galland, Chicago, IL, for Plaintiff–Appellant.

Janet L. Jannusch, David G. Lubben (argued), Keck, Mahin & Cate, Peoria, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and WOOD, JR., and EVANS, Circuit Judges.

POSNER, Chief Judge.

The plaintiff, Kenneth W. McElroy, brought this diversity suit against the B.F. Goodrich Company for breach of his three-year contract to act as exclusive sales representative for the "Condor" brand of aircraft tires, which Goodrich manufactured. The contract entitled McElroy to buy the molds used to manufacture "Condor" aircraft tires, and the tradename "Condor," in the event that Goodrich "permanently discontinue[d] production" of aircraft tires during the term of the contract. The production of Condor tires was not discontinued during the term of the contract. What happened is that Goodrich sold its entire aircraft-tires business to another tire company, Michelin, which continued their production. The question is whether a sale of productive assets, as distinguished from the abandonment of production, is permanent discontinuance of production within the meaning of the contract and Illinois law, which governs the substantive issues in this case. The district judge held that it was not, and that in any event McElroy had waived his claim, and on both grounds granted summary judgment for Goodrich. McElroy quite properly acknowledged at argument that the judge's interpretation of the contract was reasonable but he argues that the contrary interpretation is also reasonable and therefore a trial is necessary to establish the contract's true meaning. We think it is true that if the words "to permanently discontinue production" are taken in isolation, the contract is ambiguous. For there is no doubt that, in a literal sense, Goodrich discontinued production of Condor brand aircraft tires, though, equally, the production of the brand did not cease.

So let us begin to build some context. The facts as they were presented to the district judge, when construed as favorably to the plaintiff as reason permits, are as follows. Back in 1983 McElroy and his father developed, in association with the Armstrong Tire and Rubber Company, an aircraft tire that they dubbed the "Condor." The McElroys made a contract with Armstrong appointing them exclusive sales representatives for the new tire, which was manufactured in a plant owned by Armstrong. As required by the contract, the McElroys devoted their best efforts to promoting the new brand. Sales were brisk. But in 1987 Armstrong sold the plant, along with the molds used to manufacture Condor aircraft tires, and the name, and assigned the exclusive-representation contract as well, to DICO Tire, Inc. DICO, however, decided not to manufacture the tires and instead offered to sell Kenneth McElroy the molds for their scrap value, some $25,000, although the replacement cost may have exceeded $200,000.

When he received this offer, McElroy began looking for another company that would manufacture Condor aircraft tires. Goodrich was interested, and negotiations ensued dur-

ing which Goodrich informed McElroy, falsely (or so we must assume given the procedural posture of the case), that the Federal Aviation Administration would require DICO to sell the molds to Goodrich if Goodrich were to manufacture the tires. McElroy persuaded DICO to sell the molds to Goodrich at the same rock-bottom price that it had offered to sell them to him. Goodrich wanted McElroy, who had done so much to build demand for the brand, to be its exclusive sales representative. McElroy was concerned that Goodrich might "stop [production] like Armstrong had" or perhaps decide never to commence production, like DICO. So he pressed for inclusion in the contract of a clause that would allow him to recapture the molds and name if there was "some decision on BFG's part to stop production." He hoped by such a clause to regain control of the molds "if they traded hands again." Goodrich did include a clause about the discontinuance of production—the clause that is at issue in this litigation—and then placed great pressure on McElroy to sign. The form of that pressure is unclear. Apparently McElroy felt that since Goodrich already had the molds, the name, a backlog of orders, and even his list of customers, it could and would go it alone in producing Condor aircraft tires if he balked at signing the contract that Goodrich had prepared. So he signed.

That was in April of 1988. Only seven months later, Goodrich sold its entire aerospace and defense division, the assets of which included the Condor molds and name, to Michelin Aircraft Tire Corporation. As part of the sale, Goodrich assigned McElroy's exclusive sales representation contract to Michelin. McElroy remained as Michelin's exclusive sales representative for the Condor line until December 1990, when the contract expired. Michelin did not renew the contract. McElroy was out of the Condor business. He brought this suit in 1994.

We set to one side any issue of fraud, duress, or unconscionability. Despite the hints of these wrongs in the facts alleged by McElroy, the only breach of a legal duty that is charged is the breach of a written contract. The reason, we speculate (it is only speculation), is that a tort claim, a claim of unjust enrichment, or a claim for reformation of the contract would be barred by the applicable statutes of limitations, McElroy having waited six years after the alleged breach of contract to file this suit.

■ The district judge thought that by continuing for two years as Michelin's exclusive sales representative, McElroy had waived his claim of breach of contract. There was, of course, no express waiver. Nor is there any basis, despite Goodrich's argument in this court, for a defense of estoppel, for Goodrich was not harmed by McElroy's continuing on with Michelin. But if a party to a contract engages in conduct that demonstrates that he intends to give up a right, then he has waived it and cannot revive it. *Cole Taylor Bank v. Truck Ins. Exchange*, 51 F.3d 736, 739 (7th Cir.1995).

■ The contractual doctrine of waiver, whether express or implied, seems, as we observed in the *Cole Taylor* case, to rest on an idea no more complicated than that any competent adult can abandon a legal right and if he does so then he has lost it forever. But we do not see how McElroy's going to work for *Michelin* shows that he was abandoning any claim against *Goodrich*. He was simply making the best of a bad deal—and incidentally mitigating his damages. Had he refused to go to work for Michelin he would have lost the source of his livelihood (thus jacking up his damages) and might have exposed himself to legal liability to Michelin, since there was nothing in his contract with Goodrich, as we shall see, that forbade Goodrich to assign the contract. If his working for Michelin was somehow detrimental to Goodrich, he might be barred by the doctrine of estoppel from pressing this suit. But there was no detriment. The defense is waiver, requiring (in the case of implied waiver) conduct from which a confident inference of abandonment can be drawn. To prevent the doctrine of waiver from becoming a facile route to evading contractual obligations through self-serving testimony ("he waived"), the Illinois courts require that for a contractual waiver to be effective it must "either have induced reliance or ... be *clearly* inferable from the circumstances." *Id.* at

739 (emphasis in original). It is manifest that neither condition is satisfied here.

■ The district judge's alternative ground for decision was that Goodrich had not broken its contract by not offering to resell the molds and tradename to McElroy. The clause at issue reads as follows (the contract identifies Goodrich as "Condor," but for the sake of intelligibility we have restored "Goodrich" in its place):

> In the event Goodrich elects to permanently discontinue production of Aircraft Tires during the term of this Agreement, Goodrich will offer to (i) sell to McElroy the molds utilized for the Condor Aircraft Tires at a price which reflects the cost of acquiring, repairing and maintaining same, provided, that prior to such a sale of the molds the 'Condor' name and mark shall be removed; and (ii) relinquish and release to McElroy Goodrich's right and interest in and to the tradename 'Condor Aircraft Tires', without warranty, under terms and conditions to be mutually agreed at such time.

Except for the provisions of the contract relating to the term, commissions (including commissions on sales solicited by McElroy prior to the termination of the contract but filled afterward), notices, and certain expenses, all the provisions except the one just quoted impose duties on McElroy and confer rights on Goodrich. Among other things, the contract forbids McElroy to assign the contract but contains no prohibition against Goodrich's doing so.

When the contract is interpreted as a whole and with due regard to commercial realities that do not require a trial to establish, we think it reasonably plain that, as the district judge concluded, the reference to discontinuing production is to abandonment rather than to sale. Our reason is different from the district judge's, however. He thought the phrase "to permanently discontinue production" could only mean abandonment, as we do not; and he placed great weight on a decision, *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 975 F.2d 1192, 1200–02 (5th Cir.1992), that in our view casts only faint light on the present case. (Remarkably, we cannot find any case in which the contractual language at issue in the present case, or similar language, has been interpreted judicially.) A firm that among other things manufactured farm implements sold that part of its business and the issue was whether the sale entitled either the seller or the buyer to terminate the seller's franchise agreement with its dealer. The court said "no" but that it would be different if the seller had simply discontinued production, for then the dealer would have had nothing to deal. Our case is different and for us the decisive fact is the implausibility of thinking that Goodrich gave McElroy a veto over the sale of the Condor line. That is what he claims he got, in effect though not in those words. If he is right, Goodrich could not sell the line without first offering to sell the molds to McElroy for peanuts, and give him the name to boot. To see how implausible such an interpretation is, imagine that Goodrich after buying the molds and the name from DICO had poured millions of dollars into promoting the Condor line, and two years (rather than seven months) later, having greatly enhanced its value by this investment, sought to sell it to Michelin. McElroy claims that if this happened he could force Goodrich to sell him the molds for a pittance, and give him the name, making it impossible for Goodrich to make the sale to Michelin without cutting him a large slice of the pie. Such a promise one would not expect to find in a contract that is otherwise a standard exclusive rep's contract. And if McElroy had been able to strike such an advantageous deal he would not have limited it to sales within the three-year term of the contract. Under his interpretation, if Goodrich wanted to sell the Condor line within three years it had to cut him in but if it waited till the end of the period it could sell the line with no obligation to him whatsoever, no matter how much his efforts over the three years had built demand for the brand.

If the provision on discontinuance of production related to sale rather than just abandonment, moreover, one would expect a different price term—not the scrap value of the molds (the cost at which Goodrich had acquired them from DICO), plus the cost of repair and maintenance, which McElroy him-

self assumes was very slight, but some estimate of their going-concern value, which would be much closer to their replacement cost, though how much closer would depend on the durability of the molds in relation to the durability of consumer demand for Condor tires. We do not know how long the molds last, but they do not last forever, so if the brand continued to be successful its owner would eventually have to incur the cost of replacing them. The scrap value rather than the going-concern value would be the market value of the molds only if Goodrich decided to abandon the business. For in that event—if it could not find a buyer, and did not want to make the tires itself—the molds would be worth no more to it than their scrap value and it might as well give them back to McElroy at that price and let him try to peddle it to some other tire manufacturer, as he had done when Armstrong had lost interest in the Condor line.

The contract as Goodrich interprets it permitted Goodrich to sell the molds the day after it bought them and pocket the difference between the nominal price that it had paid and their real value. True; yet if at the time of the sale their market value had been much greater than their scrap value, DICO would have been acting irrationally to have sold them so cheaply. Had Goodrich like DICO changed its mind about the Condor and sold the molds and name on the same terms to another tire manufacturer before commencing production, it would have assigned McElroy's contract to the purchaser and McElroy would have been in exactly the same position he was with Goodrich, only with another manufacturer.

To put our doubts about McElroy's interpretation another way, if the parties' intention in including the "discontinue production" provision was to give McElroy blocking rights in the event that Goodrich sold the Condor line, perhaps as part of a much larger sale (Goodrich sold its aerospace and defense division to Michelin for $37 million), the form of the rights—to the molds and the name—would be incongruous. There would be nothing to prevent Michelin from duplicating the molds and making the same tires, only under another name, and if it did so it

would be very difficult for McElroy to find another tire manufacturer to make Condors. He does not suggest that he has any manufacturing capabilities himself. If the parties had wanted to condition the sale of the Condor line on McElroy's consent, or entitle him to a share of the proceeds, they would not have used the language of the "discontinue production" clause.

The only question that gives us pause is whether it is proper for us in a case decided without a trial to wander outside the "four corners" of the contract, as we may seem to have been doing. Now plainly we are entitled to look beyond the words "to permanently discontinue production." We certainly can look within the same paragraph, and there we find that the price at which McElroy is entitled to buy the molds if Goodrich discontinues production permanently is a price that would make sense only if Goodrich were abandoning the business rather than selling it to another manufacturer as a going concern perhaps after investing heavily in it. We can look to the other provisions of the contract as well and we see that they give McElroy nothing beyond what ordinary sales reps get, and this helps us see that in all likelihood the "discontinue production" provision revests rights over the Condor line in McElroy only if Goodrich can extract no further economic value from it.

Of course these interpretations are not based on the dictionary meanings of the words of the contract alone or on the rules of English grammar, but depend as well on common sense. We read the contract as a whole and ask does it "make sense" to imagine Goodrich having granted McElroy the potential huge windfall that he seeks, basically co-ownership of a business of which he was merely the sales representative, Goodrich having bought the business lock, stock, and barrel from DICO. For remember that if McElroy is right, the contract gave him a veto over Goodrich's selling the Condor line.

There is no novelty in interpreting contractual language in the light of common sense. *Rush–Presbyterian–St. Luke's Medical Center v. Hellenic Republic*, 980 F.2d 449, 454 (7th Cir.1992). All interpretation is contextual, and the body of knowledge that goes by

the name of "common sense" is part of the context of interpreting most documents, certainly most business documents. When courts say that if contract language is clear the judge should look no further, as we said recently in *CSX Transportation, Inc. v. Chicago & North Western Transportation Co.*, 62 F.3d 185, 189 (7th Cir.1995), interpreting Illinois law as here, they mean nothing more portentous than that the security that contracting parties seek when they commit their deal to writing requires a presumption that a written contract is to be interpreted without bringing in a jury to decide whose oral testimony about what the parties *really* intended is more credible. Only if the judge is stumped after making his best interpretive efforts and only if the oral or other "extrinsic" evidence that would be offered at trial would be likely to disambiguate the contract does the court convene a trial. *Rush–Presbyterian–St. Luke's Medical Center v. Hellenic Republic, supra*, 980 F.2d at 454. "If the intent of the parties can be determined from facts not in dispute, then the meaning of the contract can be determined by the court as a matter of law." *Bank of Ravenswood v. Polan*, 256 Ill.App.3d 470, 194 Ill. Dec. 697, 701, 628 N.E.2d 194, 198 (1993); see also *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir.1995); cf. *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 58 (4th Cir.1995).

Reading the contract in this case in light of what is plausible given the situation of the parties, we are confident, though not certain, that it means what Goodrich says. If Goodrich abandoned the business it would let McElroy pick up the pieces and if it sold the business McElroy would retain the protection of his exclusive sales rep's contract but would have no rights in the business itself. When we consider the evidence that McElroy submitted to the district judge to show that there was a triable issue, it is apparent that a trial would not change the picture that emerges from reading the words of the contract in their uncontested business setting. A trial might establish that McElroy really did want to get the molds back if Goodrich sold the Condor line, but he has presented no evidence that Goodrich acceded to his desire. We repeat our earlier point that there is no

issue of fraud or unconscionability by which McElroy might seek to cure his failure to drive a better bargain.

AFFIRMED.