**OKAW DRAINAGE DISTRICT OF CHAMPAIGN AND DOUGLAS COUNTY, ILLINOIS, a municipal corporation, Plaintiff–Appellee,**

v.

**NATIONAL DISTILLERS AND CHEMICAL CORPORATION, Defendant–Appellant.**

No. 95–2377.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1996.

Decided Sept. 27, 1996.

Brian L. McPheters (argued), Hatch, Blockman, McPheters & Lyke, Champaign, IL, for Plaintiff–Appellee.

Harlan Heller, Teresa Kessler Righter, David Stevens (argued), Heller, Holmes & Associates, Mattoon, IL, for Defendant–Appellant.

Before EASTERBROOK, ROVNER and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

In November 1951, defendant's predecessor, National Petro–Chemicals Corporation,[1] contracted with the Okaw Drainage District to maintain its main drainage ditch, a fourteen-mile segment of the Kaskaskia River. The contract was in effect between 1952 and 1987, when it was terminated at National's

---

1. The National Petro–Chemicals Corporation, which originally contracted with the district, assigned its contractual interest to the Industrial Water Supply Company in 1953. Industrial Water Supply executed a 1965 amendment to the agreement, and subsequently assigned its interest therein to defendant, National Distillers and Chemical Corporation, a successor in title of National Petro–Chemicals. The United States Industrial Chemical Company (U.S.I.), a division of National Distillers, was ultimately responsible for performance of the duties set out in the various agreements. In one final reorganization that apparently post-dated the filing of this appeal, National became known as the Quantum Chemical Corporation. For the sake of simplicity and to be consistent with the filings and the docket, we will refer to the defendant as National throughout.

option.[2] The maintenance tasks that National undertook included dredging the bottom of the channel to remove accumulating sediment and clearing brush from along the river's banks. National's alleged failure to perform that work led the Drainage District to file this lawsuit in 1984, and the litigation has been pending ever since, with this its fourth time on appeal.[3] Our most recent remand of the case directed the district court to make factual findings and rule on both liability and damages with respect to the dredging portion of the contract. As for brush clearing, we found that the contract had been breached and directed the district court to consider only a damages award. *See Okaw Drainage District v. National Distillers & Chemical Corp.*, 1993 WL 477915 (7th Cir. Nov.18, 1993); *Okaw Drainage District v. National Distillers and Chemical Corp.*, 1992 WL 43535 (7th Cir. Mar. 9, 1992).

Following remand, the district court conducted a three-day bench trial and subsequently issued a lengthy order outlining its findings of fact and conclusions of law.[4] The district court found that National had not met the contractual dredging requirements at any time during the entire 35 year duration of the agreement. Specifically, the court found that although National had performed some dredging in most of the river, it had never fully returned the river to its 1951 specifications, and had performed no dredging at all in the southern 10,000 feet of the river. In assessing damages, the district court held National responsible for the cost of returning the river to its original 1951 specifications, which meant removal of all sediment that exceeded the amount present in 1951. As for brush, the district court assessed damages based on the costs the District had actually incurred in clearing it.

On appeal, National does not contest the court's finding that it breached its duty to dredge, but challenges the district court's damages award. Because the district court

has broad discretion in the imposition of contract damages, we review only for clear error. *Lapinee Trade, Inc. v. Boon Rawd Brewery Co., Ltd.*, 91 F.3d 909, 911 (7th Cir.1996) (" 'Because fixing a damages award is an exercise in fact finding, only those awards that are monstrously excessive, born of passion and prejudice or not rationally connected to the evidence may be altered.' ") (quoting *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554 (7th Cir.1990)). We find no clear error in this instance. In light of our extensive history with this case, we will reiterate here only those facts that are relevant to the limited questions now before us.

## I.

As for dredging, the contract provided:

The dredging shall consist of the excavation of the bars, drifts and accumulated sediment and debris in the bottoms of the ditches, in order that the ditch bottoms may be restored to the established widths, depths and gradients as set forth and recited in the contract between the two districts establishing the joint drainage system.

(Specifications IC.) The 1951 contract required National to dredge the river at least once every ten years and envisioned that it would do so by way of a single, one-time operation. The 1965 amendment, however, provided National with another alternative; from that point forward, it could elect to clean the river bottom incrementally, "as a continuing yearly program of cleanout work," in lieu of a single operation. (Specifications IIA, amended Jan. 29, 1965.) Either way, National was required to achieve a net of one complete cleanout every ten years during the entire 1952 through 1987 period. In other words, the river had to be returned to the widths, depths and gradients set out in the original 1951 contract at least once every ten years.

2. The contract was terminated on December 1, 1987 by National's exercise of termination rights set out in the 1965 amendment.

3. Only the first appeal resulted in a published opinion, which may be found at 882 F.2d 1241 (7th Cir.1989).

4. Following the most recent appeal, we invoked Circuit Rule 36 and ordered that the case be reassigned for trial before a judge other than the one who had previously heard it.

The district court found that National had failed to restore the ditch to its 1951 specifications by way of either an ongoing yearly program or a single operation at any time during the entire 35 year period that it had contracted to do so. The court also found, and the parties do not dispute, that when the contract terminated in 1987, 104,000 cubic feet of sediment had accumulated in excess of the river's original widths, depths and gradients. As damages for the breach, the district court held National responsible for a one-time return of the ditch to its 1951 condition, which meant, with some minor exclusions,[5] removal of the entire 104,000 cubic feet of accumulated sediment.

National argues that the cost of a complete cleanout is excessive because of the option that arose in 1965 for it to conduct an ongoing rather than a one-time dredging operation. Although both systems required a complete cleanout once every ten years, National reasons that the river bottom would not have been completely cleared at any one time under the piecemeal system. In other words, although the contract required one complete cleanout by each of 1963, 1973, 1983, and, had the relationship continued, 1993, there was no time at which zero overall accumulation above the 1951 level was obligatory. National figures that its average yearly responsibility was to dredge 10 percent of the riverbed, and that in 1987, five years into the final ten year period, it was responsible for five such portions. National therefore believes it should pay for removing five times 10 percent, or 50 percent of the total 104,000 cubic feet of accumulation. And even that amount would be excessive, National contends, because it does not account for the inevitable yearly redeposition of sediment. Although it has provided no evidence to support this theory, National asks us to assume that all removed sediment is completely re-

deposited after ten years, and that this resettling occurs in equal yearly portions of 10 percent. National proposes a complicated calculation by which the 52,000 cubic feet should be further reduced to account for this yearly reaccumulation.

■ But, as justice and irony would have it, National's theory actually supports the district court's conclusion and undercuts National's own calculation. If, by one route or another, the ditch was to be returned to its original specifications once every ten years, and if National had remained current on that obligation, then its ongoing duty would have been met every ten years by simply removing all of the sediment that accumulated during that period. If every decade started with a clean slate, in other words, then that zero level of accumulation would be reaccomplished each time by merely removing any additional sediment that had been deposited during the most recent period. Now, according to National's theory, 10 percent of the sediment that would ultimately have accumulated in ten years was deposited each year. And, as National suggests we apportion its contractual obligation, it was responsible every year to remove 10 percent of the total sediment that would accumulate during ten years. But if 10 percent of the per decade total accumulated each year and 10 percent of National's per decade dredging obligation accrued each year, then National was at every point in time responsible for a net accumulation of zero. Thus, although only 50 percent of the total 1983–1993 dredging obligation had accrued after five years, so only 50 percent of the sediment that would ultimately be attributable to the period had accumulated. Even under its own theory, then, National was responsible for removing

5. As discussed below, the court found that a clause in the 1965 amendment relieved defendants of their obligation to dredge the southernmost 10,000 feet of the river from 1952 to 1965. After determining from photographic and other evidence that the sediment accumulation was similar throughout the length of the river, the district court reduced the total amount by simple proration. The southern 10,000 feet constituted 13.5 percent of the total length of the channel, and 1952 through 1965 amounted to 37 percent

of the total period covered by the contract. The court thus reduced the 104,000 figure by 5206, ultimately holding National responsible for 98,-794 cubic feet of sediment. At a rate of $1.50 per cubic yard and an additional 30 percent for engineering fees and contingency expenses, the cost of removing this sediment was determined to be $192,649. With some credits for the spot dredging that had been performed in 1986 and 1987, National's total liability for dredging was set at $172,324.

the full amount of excess sediment present no matter when the clock was stopped.

Notably, this logic renders irrelevant the question, otherwise a gaping hole in National's theory, of how much of the 104,000 cubic feet of excess sediment had accumulated after 1983.[6] For even if we were to adopt National's position, its 50 percent reduction would apply only to that amount of sediment that had been deposited during the final five years of the contract. As for that sediment in excess of the 1951 level that had been deposited before 1983, National's liability was complete, even according to its own analysis, because 100 percent of National's liability for each of those decades already had accrued. Because National is responsible for all excess sediment deposited between 1983 and 1987, as well as that attributable to prior periods, we are spared from having to apportion the net accumulation over the various periods. National is responsible for the full amount regardless of how the contractual periods are understood[7] or when the obligation to remove any particular sediment may have accrued. The district court's assessment of damages for the full amount of excess sediment was not erroneous.[8]

## II.

An interesting twist in the district court's damages determination arose from this clause in the 1965 amendment:

6. National presented no evidence to the district court to help it determine what portion of the 104,000 feet had accumulated after 1983. When asked at oral argument whether there was any way to determine what portion of the sediment had accumulated since 1983, National's counsel stated that he did not know of any.

7. It is not clear that the strict 10 year divisions continue to be a sensible view of this contract under the piecemeal dredging system. Without them, of course, the question of when National's obligation as to the various 10 percent portions arose could become complicated. That more convoluted path ultimately leads back to the same conclusion we have already reached, that a zero net accumulation was National's ongoing obligation.

8. Our analysis has assumed that National's obligation each year was to remove 10 percent of the sediment that would accumulate during a full decade. We might also understand National's annual obligation as relating to the length of the ditch rather than the accumulated sediment.

WHEREAS, National Petro–Chemicals Corporation and Industrial Water Supply Company, an Illinois corporation, have performed the construction work on the joint drainage system and Industrial Water Supply Company, an Illinois corporation, and Industrial Water Supply Company, a Delaware Corporation, have each continued to repair and maintain said joint drainage system as set forth in said agreement and the plans and specifications made a part thereof. . . .

As already noted, the district court found that National's dredging of the entire river was noncompliant, and that it had performed no dredging whatsoever in the southern-most 10,000 feet of the river. The district court found that this clause in the 1965 amendment, which accepted as adequate National's noncompliant performance up to that point, amounted to a waiver of the District's right to dredging of the southern 10,000 feet of river for the 1952–1965 period.[9] As noted above, the district court discounted the damages award by an amount that it determined would reflect the sediment that had been deposited in that portion of the river during that period of time.

That ruling raises some questions. First, it is unclear to us why the clause should have waived the District's right to dredging in the southernmost 10,000 feet prior to 1965 but

From that perspective, its duty might have been to restore 10 percent of the ditch's length to its original contours each year, which would have allowed for subsequent accumulation of excess sediment in previously-dredged portions. Under that view, something more than a zero-level of accumulation may have been consistent with contractual compliance. Because National has not relied on this theory or offered any evidence suggesting just how much accumulation might be allowable, we need not consider it.

9. Plaintiffs suggested that the language might reasonably be understood as a reference to the location of the work rather than to the quality of performance. The district court found that both interpretations were reasonable and allowed the parties to submit parol evidence to clarify the ambiguity. Both sides declined, and the district court ultimately found defendant's version to be more reasonable. The question has not been appealed.

not its right to have the remainder of the river dredged in accordance with the contractual requirements. Nor is it clear that the waiver, however construed, should have resulted in any discount at all. Regardless of what the District may have waived for the pre–1965 period, the district court found that the contractual obligation to return the river to its 1951 specifications rearose in 1965, which meant that a complete removal was once again obligatory at that time. What the District lost was a clean river bottom between 1952 and 1965; if compliance after 1965 meant removal of sediment that had been deposited in those earlier years, however, it seems that National's duty to remove it rearose at that time. Because the district has not contested this aspect of the district court's determination, however, we need not rule on this question.

█ Instead, this issue is relevant here because National argues that the clause should have worked as a prospective waiver of the District's rights to dredging of the southernmost 10,000 feet as well a retrospective one. Specifically, National suggests that the District should now be estopped from asserting any rights to dredging of the southern portion. But like the others, that argument fails. The doctrine of estoppel requires "a detrimental change of position in reasonable reliance" on the clause at issue. *United States v. Traynoff,* 53 F.3d 168 (7th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 327, 133 L.Ed.2d 228 (1995); *see also McElroy v. B.F. Goodrich,* 73 F.3d 722 (7th Cir.1996). The first weakness in National's argument is that it does not appear to have changed its position in reliance on the clause. National did not dredge the southern portion before 1965 and it did not do so thereafter. National might argue, of course, that its decision to continue ignoring the southern 10,000 feet was based on the clause, which it understood to be a waiver, and that it therefore "changed" its position, which would otherwise have been to begin performance in 1965. In any event, such a change in position in reliance on the clause would not have been reasonable. The clause, which is general and vague, would have to be understood as overriding a clause in the underlying contract that specifically described the covered area to include the southern 10,000 feet. It would not be reasonable to rely on the general provision in deciding to ignore one's duties under the more specific one. Finally, National has failed to establish that its "change" of position was in any way detrimental. National did nothing, at a cost of nothing. The damages that it must now pay reflect only the cost that it would have borne had it performed its contractual duty. National suffered no detriment by relying on its understanding that the District had waived its right to performance.

### III.

Finally, National contests the district court's calculation of damages for its failure to clear brush alongside the ditch, specifically contesting its calculation for the southern 10,000 feet of the river. The district court's award was based on the rates that the District paid to contractors that it hired to do the work in National's stead. The work was performed by two different firms, one in the upper portion of the river, and one in the southern 10,000 feet of the river. Both firms charged similar rates per mile for light, medium and heavy brush, and the damages award essentially reflects those rates, discounted to account for both the increase in labor costs and the growth of additional brush between the time of the breach and the time that the work was performed. National argues that this award was clearly erroneous because the firm that cleared the upper portion included both riverbanks in its per mile rate while the firm that cleared the lower portion counted only one side in its mile. According to National, then, the latter firm actually charged twice as much as the former, so that the work could have been done for half of the cost.

█ But National never raised this point before the district court, which had no opportunity to consider it, and it is therefore waived. Nor has National offered any evidence regarding which rate was reasonable. It is certainly plausible, as the District contends, that the upper portion was cleared for a bargain basement rate, and the charge for the lower portion actually reflected the mar-

ket rate for clearing. If the District simply got lucky in its negotiation for the upper portion, then National has actually benefitted from that bargain in being charged only the discounted rate for the upper portion. Because of its waiver, however, National presented no evidence to allow for an educated resolution of this issue, and has forfeited the opportunity to pursue it.

## IV.

The district court's award of damages was not erroneous. The judgment of the district court is AFFIRMED.