J-E01002-16

2016 PA Super 177

| DANIELLE FISHER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| --- | --- |
| v. | |
| A.O. SMITH HARVESTORE PRODUCTS, INC.; A.O. SMITH CORPORATION; A.O. SMITH (HARVESTORE PRODUCTS); HARVESTORE SYSTEMS T/D/B/A HARVESTORE; COLUMBIA TEC TANK; CST INDUSTRIES, INC.; AND PENN JERSEY PRODUCTS, INC. | |
| APPEAL OF: CST INDUSTRIES, INC. | No. 727 EDA 2013 |

Appeal from the Order Entered February 8, 2013
In the Court of Common Pleas of Bucks County
Civil Division at No: 2011-03913

| DANIELLE FISHER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| --- | --- |
| v. | |
| A.O. SMITH HARVESTORE PRODUCTS, INC.; A.O. SMITH CORPORATION; A.O. SMITH (HARVESTORE PRODUCTS); HARVESTORE SYSTEMS T/D/B/A HARVESTORE; COLUMBIA TEC TANK; CST INDUSTRIES, INC.; AND PENN JERSEY PRODUCTS, INC. | |
| APPEAL OF: CST INDUSTRIES, INC. | No. 1960 EDA 2013 |

Appeal from the Order Entered June 13, 2013
In the Court of Common Pleas of Bucks County
Civil Division at No: 2011-03913

| | |
|---|---|
| DANIELLE FISHER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| A.O. SMITH HARVESTORE PRODUCTS, INC.; A.O. SMITH CORPORATION; A.O. SMITH (HARVESTORE PRODUCTS); HARVESTORE SYSTEMS T/D/B/A HARVESTORE; COLUMBIA TEC TANK; CST INDUSTRIES, INC.; AND PENN JERSEY PRODUCTS, INC. | |
| APPEAL OF: A.O. SMITH CORPORATION | No. 2000 EDA 2013 |

Appeal from the Order Entered June 13, 2013
In the Court of Common Pleas of Bucks County
Civil Division at No: 2011-03913

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., BOWES, SHOGAN, LAZARUS, MUNDY, OTT, STABILE, and DUBOW, JJ.

OPINION BY STABILE, J.:                    **FILED AUGUST 12, 2016**

Plaintiff, Danielle Fisher, filed this lawsuit after she injured her hand operating a roller mill manufactured by Appellee/Cross-Appellant A.O. Smith Corporation ("Smith").  A roller mill is a machine that grinds grain for use in animal feed.  Harvestore Systems t/d/b/a Harvestore ("Harvestore"), a former subsidiary of Smith, manufactured the involved roller mill (the "Roller Mill") in 1981.  Presently in dispute is whether Smith or Appellant/Cross-Appellee CST Industries, Inc. ("CST") is liable for the Roller Mill.

After Fisher commenced her product liability claim, Smith demanded indemnification and a defense from CST, claiming CST acquired liability for

- 2 -

the Roller Mill through a series of asset purchase agreements.  CST declined to defend or indemnify Smith, and the two entities filed cross-claims for indemnification against each other.  On January 14, 2013, the trial court granted Smith's motion for summary judgment against CST, finding CST assumed liability for the Roller Mill.  Smith subsequently petitioned for counsel fees and expenses it incurred in defending Fisher's claims and litigating against CST.  On February 8, 2013, the trial court entered an order accepting the parties' settlement of the Fisher litigation.[1]  On June 13, 2013, the trial court denied Smith's petition for counsel fees.

These consolidated appeals arise from the trial court's February 8, 2013 and June 13, 2013 orders.  CST filed a "protective appeal" from the trial court's February 8, 2013 order, concerned that it rendered the summary judgment order final.  Both parties appealed from the June 13, 2013 order—Smith as the aggrieved party and CST to protect itself if the February 8, 2013 order was not the final appealable order.[2]  On December 9, 2014, a

_____

[1]  Pursuant to the summary judgment order, CST paid the amount of the settlement attributable to Smith.  CST also reserved its right to appeal that order.

[2]  In the time between the two orders, CST raised new arguments—based on an agreement referred to *infra as* the "Recknell Agreement"—challenging the trial court's entry of summary judgment.  The parties disputed whether CST was permitted to raise new arguments after the February 8, 2013 order.  CST admits that statutory attorney's fees are an ancillary matter on which the trial court can continue to proceed after entry of a final order.  ***Samuel-Bassett v. Kia Motors America, Inc.***, 34 A.3d 1, 49 (Pa. 2011), *cert.*
*(Footnote Continued Next Page)*

divided three-judge panel of this Court vacated the trial court's order entering summary judgment in favor of Smith.[3] We granted reargument *en banc* by order of February 20, 2015. After careful review, we vacate the order granting Smith's motion for summary judgment and dismiss the remaining appeals as moot.

We begin with CST's appeal of the trial court's order granting Smith's motion for summary judgment on Smith's cross-claim. CST raises the following assertions of error:

> 1. Did the Court of Common Pleas err as a matter of law in determining that CST expressly assumed liabilities from a line of business other than the line that CST had acquired? In particular, did the trial court err when it:
>
> > a. failed to construe the Asset Purchase Agreement ("APA") in its entirety and thus did not give proper weight to the structure of assumed and excluded liabilities or defined terms, including, *inter alia*, "Division" and "Business";

*(Footnote Continued)* _____

*denied*, 133 S. Ct. 51 (2012). CST also states that Pennsylvania courts have not addressed whether pursuit of contractual attorney's fees is an ancillary matter.

For present purposes, we will treat the February 8, 2013 order as final and appealable. Our ultimate decision does not rest on any argument CST raised subsequent to that order. Given CST's timely appeals from the February 8 and June 13 orders, our jurisdiction is not in doubt. We will not address whether a contract-based fee petition is an ancillary matter, as that issue has no bearing on the outcome of this appeal.

[3] Our analysis did not garner a majority, as one Judge dissented and one Judge concurred in the result.

    b. inferred from the inclusion of a single case on an exhibit to A.O. Smith's representations and warranties about litigation pending against it that CST assumed all of the liabilities of all lines of business manufactured by A.O. Smith's former subsidiary; and

    c. failed to address the language the parties used in the APA?

    2. Did the Court of Common Pleas fail to correctly apply principles of Illinois law governing indemnity agreements and successor liability, as well as Pennsylvania summary judgment principles?

    3. Could the trial court have corrected its errors in this regard before it entered a final order on the merits?

CST's Substituted Principal Brief, at 6-7.

We will address CST's first two arguments together. Based on our resolution of those, we have no need to address the third. The Pennsylvania Rules of Civil Procedure govern summary judgment motions as follows:

**Rule 1035.2.  Motion**

    After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

    (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

    (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2. Smith moved for and won summary judgment under Rule 1035.2(1). The trial court's entry of summary judgment presents a question of law, and therefore our standard of review is plenary and our scope of review is *de novo*. ***City of Philadelphia v. Cumberland Cnty. Bd. of Assessment Appeals***, 81 A.3d 24, 44 (Pa. 2013).

> When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt.

***Summers v. Certainteed Corp.***, 997 A.2d 1152, 1159 (Pa. 2010) (internal citations and quotation marks omitted). We will reverse the trial court only if we discern an error of law or abuse of discretion. ***Id.***

Smith argues, and the trial court found, that CST assumed liability for the Roller Mill through the following series of events. In 1996, Harvestore entered an asset purchase agreement (the "Recknell Agreement") with Recknell Industries, Ltd. ("Recknell"), whereby Recknell purchased Harvestore's line of automated products, including roller mills. Harvestore retained liabilities arising from automated products manufactured prior to the closing date of the Recknell Agreement. The parties dispute whether those retained liabilities included the Roller Mill. Smith dissolved Harvestore in 1997 and transferred its assets and liabilities to a division of Smith known as Engineered Storage Products Company ("ESPC"). CST and ESPC entered

an Asset Purchase Agreement (the "APA") on December 15, 2000, whereby CST purchased ESPC's assets and certain of its liabilities. The trial court determined that Harvestore retained liability for the Roller Mill after the Recknell Agreement, and that CST assumed liability for the Roller Mill pursuant to the APA. The trial court further determined that the APA required CST to indemnify Smith for liability arising out of this action.

The parties call upon us to construe the APA and the Recknell Agreement, both of which are governed by Illinois law.

> The basic rules of contract interpretation are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties. A court will first look to the language of the contract itself to determine the parties' intent. A contract must be construed as a whole, viewing each provision in light of the other provisions. The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract.

*Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) (citations omitted).

"Under Illinois law, which the parties agree governs this case, the starting point of any contract analysis is the language of the contract itself. If the language unambiguously answers the question at issue, the inquiry is over." *Church v. Gen. Motors Corp.*, 74 F.3d 795, 799 (7th Cir. 1996). "In interpreting all contracts, including indemnity agreements, the paramount concern and overriding purpose is to give effect to the intent of

the parties." *Id.* Further, "indemnity agreements are not favored in Illinois and thus are strictly construed against the indemnitee." *Id.*[4]

Similarly, the Appellate Court of Illinois has written:

> When construing an agreement to indemnify, the agreement must be given a fair and reasonable interpretation based upon a consideration of all the language and provisions. The interpretation of an indemnity agreement also depends upon the factual setting of the case. An indemnity agreement must be set forth in clear and explicit language so that an indemnitor's obligations are manifestly determinable. Although indemnity agreements are not void, they nevertheless are not favored and must be strictly construed.

*Charter Bank v. Eckert*, 585 N.E.2d 1304, 1310 (Ill. App. Ct. 1992); *see also Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 743-44 (7th Cir. 1996).

For reference, we set forth the pertinent provisions of the Recknell Agreement:

> WHEREAS, Seller, among other things, designs, manufactures, markets, supplies and sells roller mills, batch mixers and agricultural feed handling conveyors and

_____

[4] Smith cites § 12.8 of the APA, which states that the APA must be construed neutrally:

> This Agreement constitutes the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based on the source of the draftsmanship hereof.

APA § 12.8. In rendering our decision, we do not apply any construction based on draftsmanship. We do, however, apply the law of Illinois governing indemnity agreements.

replacement parts for such equipment ("Automated Products") at its plant facility in DeKalb, Illinois; and

WHEREAS, Purchaser desires to purchase from Seller and Seller desires to sell to Purchaser certain assets of Seller relating to Seller's Automated Products business, ("the Automated Products Business") upon the terms and conditions set forth in this Agreement;

1. SALE AND PURCHASE OF ASSETS

1.1     Assets Included.     Subject to the terms and conditions of this Agreement, Seller agrees to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser hereby agrees to purchase, acquire and accept the Assets (as defined below).   The "Assets" shall consist of the following assets used by Seller in the Automated Products Business:

(a)   all machinery, storage racks, assembly tables, personal property and equipment listed in Schedule 1.1(a) attached hereto (the "Equipment");

[. . .]

1.2     Assets Not Included.  The Assets do not include:

[. . .]

(b)   Automated Products manufactured by Seller on or before September 13, 1996[.]

[. . .]

3. LIABILITIES AND OBLIGATIONS

3.1     Liabilities Retained by Seller.     All liabilities, obligations, warranties and commitments of every kind or nature whatever, whether known or unknown, liquidated or unliquidated, fixed or contingent, which in any way arise from or relate to Seller's ownership or use of the Assets, operation of the Automated Products Business, and the sale of Automated Products manufactured on or before September 13, 1996, whenever arising, shall remain the liabilities, obligations, warranties and commitments of Seller.  All such liabilities, obligations, warranties or commitments, and all such claims and demands based thereon or attributable

thereto shall remain the sole obligation and responsibility of Seller. All claims, liabilities, losses and obligations retained by Seller shall be collectively referred to as "Retained Liabilities."

Recknell Agreement, 9/3/96 (underscoring in original).[5]

To summarize the foregoing, the Recknell Agreement excludes from the sale certain Assets, namely "Automated Products manufactured by Seller on or before September 13, 1996[.]" Recknell Agreement, § 1.2(b). Correspondingly, the Recknell Agreement provides that Harvestore, as seller, retained "all liabilities [. . .] of every kind [. . .] which in any way arise from or relate to Seller's ownership or use of the Assets, operation of the Automated Products Business, and the sale of Automated Products manufactured on or before September 13, 1996, whenever arising[.]" *Id.* at § 3.1. Recknell, as purchaser, assumed liabilities arising "from the design, manufacture, marketing, and supply of Automated Products; and from the sale by Purchaser of Automated Products from and after the date of Closing[.]" *Id.* at § 3.3. Automated Products include roller mills. *Id.* at Page 1, Paragraph 2. As noted above, the Harvestore manufactured and sold the Roller Mill in 1981.

Thus, the plain language of the Recknell Agreement indicates Harvestore retained liability for the Roller Mill.[6] Moreover, the Recknell

_____

[5] The Recknell Agreement appears in the certified record as an exhibit to CST's October 15, 2012 motion for summary judgment.

Agreement's language is in accord with Illinois law holding that an "indemnity agreement must be set forth in clear and explicit language so that an indemnitor's obligations are manifestly determinable." ***Charter Bank***, 585 N.E.2d at 1310. We agree with the trial court that no issue of material fact exists as to Harvestore's retention of liability for the Roller Mill after the Recknell Agreement.

Next, we turn to the APA.[7] Once again, we set forth the pertinent provisions for reference:

<u>AGREEMENT FOR PURCHASE AND SALE OF ASSETS</u>

THIS AGREEMENT (this "<u>Agreement</u>"), dated as of the 15th day of December, 2000, is made by and between A.O. SMITH CORPORATION, a Delaware Corporation (hereinafter "<u>Seller</u>"), and CST INDUSTRIES, INC., a Delaware corporation (hereinafter "<u>Buyer</u>").

The Seller, through its division, Engineered Storage Products Company (the "<u>Division</u>"), is engaged in the business of designing, engineering, manufacturing, marketing and erecting

*(Footnote Continued)* ⸻

[6] CST argues on appeal that Recknell assumed liability for the Roller Mill under the Recknell Agreement. That argument contradicts CST's answer to Smith's motion for summary judgment (hence the dispute over which order on appeal was final), wherein CST stated that liability for the Roller Mill remained with Harvestore after the Recknell Agreement. CST's Answer to Smith's Motion for Summary Judgment, 11/16/12, at ¶ 7. Further, CST's current construction of the Recknell Agreement commits many of the same analytical errors CST finds in Smith's construction of the APA. As set forth above, we believe the Recknell Agreement is clear on Harvestore's retention of liability for the Roller Mill. As set forth below, we cannot say the same for the APA.

[7] With respect to excerpts from the APA set forth in this Opinion, all underscoring appears in the original.

liquid and dry bulk storage tanks.  The Buyer desires to purchase substantially all of the operating assets of the Division and to assume certain of the operating liabilities as specified herein, and the Seller desires to sell the Division as an ongoing business and delegate such liabilities to the Buyer, on the terms and subject to the conditions set forth in this Agreement.  The term "Division" is sometimes used herein as though it were a separate entity; when so used the term means that the Seller is the entity referred to but only insofar as the activities, assets or liabilities relate to the Division and are accounted for as part of the Division's activities.  The term "Business" means the business of the Division as conducted as of the date of this Agreement.

In reliance upon the representations and warranties made herein and in consideration of the mutual covenants and agreements herein contained, the Buyer and the Seller hereby agree as follows:

ARTICLE I
PURCHASE AND SALE OF ASSETS

1.1  Purchase and Sale.  Subject to the terms and conditions contained herein, at the Closing, the Seller shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and accept from the Seller, all of Seller's right, title and interest in and to all of the assets used primarily or held for use primarily in the Division or the Business, and all tangible assets located at the Facilities (as defined in Section 1.2.1), as the same are more specifically set forth in Section 1.2.2 hereof, except the Excluded Assets and Nontransferred Assets (hereinafter defined) (collectively, the "Purchased Assets").

1.2  Definitions; Purchased Assets.

1.2.1 Definitions.  For purposes of this Agreement, the following terms have the meanings set forth below:

[. . .]

"Assumed Liabilities" means only the following liabilities of Seller relating to the Division, the Business or the Purchased Assets as of the Closing Date (hereinafter defined), subject to Section 1.5 and Article XI:  [. . .] (C) all liabilities in the nature of product liability, including, without limitation, any liability for claims made for injury to person, damage to property or other

damage arising from, caused by or arising out of any product designed, manufactured, assembled, installed, sold, leased or licensed by the Division, prior to the Closing date[.]

[. . .]

1.4    Assumed Liabilities.    Provided that the transactions herein contemplated are consummated, and subject to Section 1.5 and Article XI, Buyer will assume and pay, perform and discharge when due, and will indemnify Seller against, the Assumed Liabilities and no others, except as provided herein.

1.5    Excluded Liabilities.    Buyer shall not be responsible for any liability or obligation of Seller that is owed to or at the behest of a third party other than the Assumed Liabilities nor for any liability or obligation if and to the extent Seller has an indemnification obligation with respect thereto under Article XI (the "Excluded Liabilities").    Without limitation, Buyer shall not be responsible for, and the Excluded Liabilities shall include:

[. . .]

(o)    any liabilities of Seller arising out of any litigation matters identified in Exhibit 2.13, other than those maters referenced in Item 2 of Exhibit 2.13.

[. . .]

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF SELLER

2.8    No Undisclosed Liabilities, Claims, etc.    Except [. . .] liabilities expressly disclosed in any Exhibit to this Agreement [. . .] the Division or Business has no liabilities, obligations or claims (absolute, accrued, fixed or contingent, matured or unmatured, or otherwise) that are owed to or at the behest of a third party that would constitute Assumed Liabilities, including liabilities, obligations or claims which may become known or which arise only after the Closing and which result from actions, omissions or occurrence of the Seller or the Division prior to the closing.

[. . .]

2.13 Litigation.    Except as set forth in Exhibit 2.13, there is no suit, action, investigation or proceeding pending or, to the knowledge of Seller, threatened expressly against the Seller, the

Division or the Purchased Assets which, if adversely determined, would adversely affect the business, operations, earnings, properties or the financial condition of the Division nor is there any judgment, decree, injunction, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator outstanding against Seller, the Division or the Purchased Assets having, or reasonably likely to have, any such effect.

[. . .]

2.22 <u>Products Liability</u>. Seller makes no representation or warranty in this Agreement as to any matters relating to product liability except in this <u>Section 2.22</u>. Except as set forth in <u>Exhibit 2.22</u>, to the knowledge of Seller, there exists no claim against Seller in the nature of product liability, including without limitation, any claim for injury to persons, damage to property or other damage arising from, caused by or arising out of any product designed, manufactured, assembled, installed, sold, leased or licensed, or any service rendered, no reasonable basis exists for any such claim and the Balance Sheet reserves are adequate to cover the claims disclosed in <u>Exhibit 2.22</u>.

APA, 12/15/00.[8]

Exhibit 2.13 to the APA provides:

**LITIGATION**

1. See <u>Exhibit 1.5(k) and 1.5(m)</u>.

2. Litigation with respect to matters relating to product liability and product warranty is disclosed on <u>Exhibit 2.22</u> and <u>Exhibit 2.24</u>, respectively.

3. <u>Joest Vibratech, Inc. v. North Star Steel Company, Engineered Storage Products, et al</u>; United States District Court, Northern District of Ohio Eastern Division; Case No. 4:00CV810.

---

[8] The APA appears in several places in the certified record, including Exhibit 6 to CST's October 15, 2012 motion for summary judgment.

4. <u>A.O. Smith Engineered Storage Products Company v. Prime Systems, Inc.</u>; Circuit Court, Pasco County, Florida; Case No. 2000 26 66 CA.

5. <u>Lemelson Medical, Education & Research Foundation Limited Partnership v. A.O. Smith Corporation, et al</u>; United States District Court, District of Arizona; Case No. CIV 000662 PHX SMM.

APA, Exhibit 2.13.

Finally, Exhibit 2.22 of the APA provides:

**PRODUCTS LIABILITY**

1. See <u>Exhibit 1.5(k)</u>.

2. In October 1999, two men died when they were overcome by fumes after becoming trapped in a Harvestore silo while performing maintenance work.  To date, no claim has been asserted against Seller.  Seller is uncertain whether it will have any liabilities relating to this incident.

3. In July 2000, one maintenance man died and two maintenance men were critically injured while working on a sugar silo when a large mass of sugar fell.  Seller had sold the silo tank to Shick-Tube for its customer, Parco Bakery.  To date, no claim has been asserted against Seller.  Seller is uncertain whether it will have any liabilities relating to this incident.

4. Teadit North American ("<u>Teadit</u>") recommended rubber gaskets to Seller for use in storage tanks being installed in the Stocker Resources project in San Luis Obispo, California. Seller placed two orders for the rubber gaskets with Teadit, which does not manufacture the product and ordered the product from Industrial & Military Technologies.  The rubber material in the gaskets disintegrated.  Costs to rehabilitate the project are projected to exceed $200,000.  Teadit's insurance company is reviewing Seller's claim with respect to the product.

5. <u>William Smith v. A.O. Smith Harvestore Products, Inc.</u>; Supreme Court, County of Jefferson, New York; Index No. 94-1687.

- 15 -

6. <u>Continental Insurance Company and Pine Grove Landfill, Inc. v. Peabody TecTank, Inc. and Johnstown Construction Company</u>; Court of Common Pleas, Schuylkill [sic] County, Pennsylvania; Case No S-17-1988.

7. <u>Rodney Woods and Janet Woods v. A.O. Smith Harvestore Products, Inc. et al</u>; Circuit Court of the Eighth Judicial District, Pike County, Illinois; Case No. 00-L-12.

APA, Exhibit 2.22.

As we have explained, our analysis under Illinois law begins with the language of the contract. **Charter Bank**, 585 N.E.2d at 1310. For an indemnity agreement, Illinois law requires the parties' intent to be manifestly determinable. **Id.** We first consider the APA's treatment of ESPC as a "Division."

> [Smith], through its division, [ESPC] (the "<u>Division</u>"), is engaged in the business of designing, engineering, manufacturing, marketing and erecting liquid and dry bulk storage tanks. [CST] desires to purchase substantially all of the operating assets of the Division and to assume certain of the operating liabilities of the Division as specified herein, and [Smith] desires to sell the Division as an ongoing business and delegate such liabilities to [CST], on the terms and subject to the conditions as set forth in this Agreement.

APA, Preamble, at ¶ 2.[9] The APA further provides: "<u>Division</u>" is sometimes used herein as though it were a separate legal entity; when so used the term means that [Smith] is the entity referred to but only insofar as the

---

[9] The APA is organized in consecutively numbered sections except for three introductory paragraphs preceding the first numbered section. For clarity of citation, we will refer to these three introductory paragraphs as the Preamble.

activities, assets or liabilities relate to the Division and are accounted for as part of the Division's activities." *Id.* "The term 'Business' means the business of the Division as conducted as of the date of this Agreement." *Id.*

To summarize so far, CST agreed to purchase the operating assets of ESPC and to assume certain specified liabilities. **As of the closing date**, ESPC's Business involved fabricating and selling bulk storage tanks. ESPC's Business **as of the closing date** did not involve fabricating and selling roller mills, and never had.

Next, we consider the APA's puzzling treatment of the word "Division." The APA purportedly defines ESPC as the Division, but also provides that the term Division refers to Smith in cases where it appears the Division is a separate legal entity. ESPC is not a separate legal entity or wholly owned subsidiary of Smith, but part of the same legal entity as Smith. As such, ESPC's assets and liabilities are Smith's assets and liabilities.

The Preamble explains that CST will assume certain of the Division's liabilities, and § 1.2.1 of the APA defines those as:

> "'Assumed Liabilities' means only the following liabilities of Seller **relating to the Division, the Business or the Purchased Assets as of the Closing Date** [. . .] (C) **all liabilities in the nature of product liability**, including, without limitation, any liability for claims made for injury to person, damage to property or other damage arising from, caused by or arising out of **any product designed, manufactured, assembled, installed, sold, leased or licensed by the Division**, prior to the Closing date.

*Id.* at § 1.2.1 (Assumed Liabilities) (underscoring in original, bolded emphasis added). Section 1.4 of the APA provides that CST "will assume and pay, perform and discharge when due, and will indemnify Seller against, the Assumed Liabilities and no others, except as provided herein." *Id.* at § 1.4.

As explained above, Harvestore retained liability for roller mills manufactured prior to the Recknell Agreement. Smith subsequently dissolved Harvestore and transferred Harvestore's assets and liabilities to ESPC. CST argues ESPC was never in the business of designing or manufacturing roller mills, and therefore the APA's definition of assumed liabilities does not encompass the Roller Mill. Smith argues that the APA defines "Division" more broadly than "Business," and that while ESPC was never in the business of selling roller mills, ESPC assumed Harvestore's roller mill liabilities for tax and accounting purposes.[10]

Language in the first sentence of the Assumed Liabilities definition, "relating to the Division, the Business, or the Purchased Assets . . . ,"

_____

[10] The parties dispute the import of documentary evidence purportedly indicating CST's awareness of the roller mill liabilities on ESPC's books. The trial court's decision rested on the APA's plain language. Trial Court Opinion, 10/1/13, at 7. In vacating the trial court's order, we conclude only that the APA's plain language does not justify entry of summary judgment in Smith's favor. If, under the circumstances of this case, any extrinsic evidence is admissible and relevant, its import will depend on findings of fact. *See Farm Credit Bank v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). Any such findings must come from the trial court in the first instance.

supports Smith's argument that "Division" as used in the APA is a broader term than "Business." In other words, "Division" arguably encompasses more than the "Business" of fabricating bulk storage tanks. Nonetheless, the definition of Assumed Liabilities in § 1.2.1 does not, in and of itself, establish that CST agreed to assume liability for all future litigation involving roller mills—an asset CST did not acquire and that was never a part of its business or that of ESPC. Stated another way, roller mills were not among the Purchased Assets, nor were they ever a part of the Business of ESPC, nor did they have any obvious relation to Smith's ESPC Division as of the closing date of the APA. We observe that the trial court's opinion ignores the first sentence of § 1.2.1, which refers to the closing date. While we agree with Smith that the Preamble and § 1.2.1 do not foreclose the possibility that CST assumed liabilities unrelated to the bulk storage tank Business,[11] we do not believe these sections confirm that CST assumed additional liabilities. As stated several times above, Illinois law requires "clear and explicit language so that an indemnitor's obligations are manifestly determinable." **Charter Bank**, 585 N.E.2d at 1310.

_____

[11] Indeed, § 1.4, in stating CST will discharge the Assumed Liabilities "and no others, **except as provided herein**[,]" arguably supports a conclusion that CST agreed to discharge certain liabilities not within the contractual definition of Assumed Liabilities. APA, § 1.4 (emphasis added).

Article II of the APA contains a section titled "No Undisclosed Liabilities, Claims, etc." *Id.* at § 2.8. That section provides, in relevant part, that except for:

> liabilities expressly disclosed in any Exhibit to this Agreement [. . .] the Division or Business has no liabilities, obligations or claims (absolute, accrued, fixed or contingent, matured or unmatured, or otherwise) that are owed to or at the behest of a third party that would constitute Assumed Liabilities, **including liabilities, obligations or claims which may become known or which arise only after the Closing** and which result from actions, omissions or occurrences of the Seller or the Division prior to the closing.

*Id.* at § 2.8 (emphasis added). The APA contains several exhibits that expressly disclose pending litigation. Among those is Exhibit 2.22, which corresponds to § 2.22 of the APA. Section 2.22 is titled "Products Liability." It provides as follows:

> Seller makes no representation or warranty in this Agreement as to any matters relating to product liability except in this <u>Section 2.2</u>. Except as set forth in <u>Exhibit 2.22</u>, to the knowledge of Seller, there exists no claim against Seller in the nature of product liability, including without limitation, any claim for injury to persons, damage to property or other damage arising from, caused by or arising out of any product designed, manufactured, assembled, installed, sold, leased or licensed, or any service rendered, no reasonable basis exists for any such claim and the Balance Sheet reserves are adequate to cover the claims disclosed in <u>Exhibit 2.22</u>.

*Id.* at § 2.22.

Exhibit 2.22 is a numbered list of seven items, one of which is a products liability claim involving a roller mill. It is captioned "William Smith v. A.O. Smith Harvestore Products, Inc." *Id.* at Exhibit 2.22, ¶ 5. Based on

this item, the trial court and Smith argue that CST assumed liability for any and all such claims. We cannot agree.

As we have already explained, we do not believe the APA's definition of Assumed Liabilities is sufficiently clear to encompass all future roller mill liability. Nothing in the APA supports a conclusion that the items in Exhibit 2.22 constitute Assumed Liabilities. The contractual definition of Assumed Liabilities does not reference Exhibit 2.22. Rather, § 1.5, governing "Excluded Liabilities," references Exhibit 2.22. Section 1.5 provides: "Buyer shall not be responsible for any liability or obligation of Seller that is owed to or at the behest of a third party other than the Assumed Liabilities[.]" *Id.* at § 1.5. Section 1.5 includes an itemized list of Excluded Liabilities, one of which is "litigation matters identified in Exhibit 2.13, other than those matters referenced in Item 2 of Exhibit 2.13." *Id.* at § 1.5(o). Exhibit 2.13, in turn, contains a list of five items. Item 2 on that list refers to Exhibit 2.22. In other words, the APA carves Exhibit 2.22—the only reference to litigation involving a roller mill—out of a list of otherwise excluded activities.

In summary, Smith advocates for a conclusion that CST assumed liability for rollers mills, an asset that never was part of ESPC's business or that of CST. As of the APA's closing date, ESPC was in the business of bulk storage tanks. Nothing in the APA indicates that roller mill liabilities were among ESPC's liabilities at that time. In our view, the APA does not set forth

a clear expression of the parties' intent for CST to assume liability for any future claims involving roller mills, including the Fisher litigation.

Ultimately, our decision rests on the standard of review applicable to summary judgment motions, which are to be granted only in cases where the moving party's right to judgment is "clear and free from all doubt." **Summers**, 997 A.2d at 1159. Our analysis of the APA convinces us that the trial court erred in concluding that Smith's right to judgment is clear and free from doubt. The APA, insofar as it governs CST indemnity obligation in the current matter, is convoluted and confusing. The law of Illinois requires clarity, such that CST's obligations are manifestly determinable. For these reasons, the trial court erred in granting Smith's summary judgment motion.

At docket number 727 EDA 2013, we vacate the order of February 8, 2013 insofar as it rendered final the trial court's summary judgment order in favor of Smith. We do not disturb the remainder of that order. Given our disposition of at 727 EDA 2013, we dismiss the appeals at numbers 1960 EDA 2013 and 2000 EDA 2013 as moot.

Order of February 8, 2013 affirmed in part and vacated in part. Appeals at 1960 EDA 2013 and 2000 EDA 2013 dismissed as moot. Case remanded. Jurisdiction relinquished.

President Judge Emeritus Ford Elliott, Judge Bowes, Judge Mundy, and Judge Ott join the opinion.

Judge Dubow files a concurring opinion in which President Judge Emeritus Bender, Judge Lazarus, and Judge Ott join.

President Judge Emeritus Bender concurs in the result.

Judge Shogan files a dissenting opinion.

This decision was reached prior to Judge Mundy's appointment to the Supreme Court.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/12/2016